IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.

JEAN- MARC VUJASIN,                    **08-22048-CIV-COOKE/BANDSTRA**
DAVY VUJASIN,

                          Plaintiffs,

v.

CHEF VINCENT, INC.,
VINCENT THILLOY,                        JURY TRIAL
                                        DEMANDED
                     Defendants.
_____/

FILED by _**VK**_ D.C.
ELECTRONIC

**JULY 18, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## COMPLAINT

Plaintiffs Jean- Marc and Davy Vujasin sue Defendants as follows:

### NATURE OF ACTION

1.     This is an action brought by Plaintiffs, two French Nationals, to recover compensatory, punitive, and equitable relief against Defendant, a Frenchman who cleverly, through acts of trickery and deceit, swindled Plaintiffs out of hundreds of thousands of dollars through a securities based-fraud scheme. The Defendant carried out his scheme by soliciting and convincing the Plaintiffs, through misrepresentations and omissions, to purchase the stock of a company called "Chef Vincent, Inc." that he represented owned a restaurant, named "Chef Vincent," on famous Ocean Drive in Miami Beach.  The Defendant fraudulently induced the Plaintiffs to enter into the stock purchase by providing false financial information consisting of assets that Chef Vincent, Inc. did not own.  Plaintiffs allege herein that through their conduct, the Defendants violated federal and state securities laws, breached a stock purchase agreement, and committed fraud and a civil theft. Finally, Plaintiffs seek a declaratory judgment that they are not obligated to reimburse Defendant-seller for a security deposit.

## JURISDICTION AND VENUE

2.      This action arises under Section 10(b) of the Securities Exchange Act of 1934, as amended ("Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated by the SEC thereunder.  The Plaintiffs also bring Florida state law claims arising under the Florida Securities and Investor Protection Act, Fla. Stat. §517, *et seq,* Florida's Civil Theft Statute, Fla. Stat. §772.11, common law fraud, and civil theft claims over which this Court has pendent, ancillary and/or supplemental jurisdiction.   Finally, Plaintiffs seek declaratory relief, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §2201, declaring that Plaintiffs have no obligation to return to Defendant Thilloy his security deposit. The Court also has jurisdiction over this action pursuant to 28 U.S.C. §1332 as the parties are citizens of different States and the amount in controversy with regard to the claims exceeds $75,000, exclusive of interest, costs and attorneys' fees.

3.      Venue is proper in this district pursuant to 28 U.S.C. Section §1391 and because the Defendants conducted business in this judicial district and a substantial part of the events or omissions giving rise to this lawsuit occurred in this judicial district.

4.      The Miami Division of this district encompasses Miami-Dade County.   Miami Dade County has the greatest nexus with this cause of action because the claims arose in Miami-Dade County and Miami Dade County is the residence or principal place of business of the Defendants.

5.      All of the conditions precedent to this lawsuit have occurred, have been satisfied or have been waived.

## PARTIES

6.      Plaintiff Jean-Marc Vujasin is a citizen of France with an address of le Capitole B 415 Blvd. d' Alger, Frejis, 83600 France.  For over 20 years, Jean-Marc has successfully owned and operated restaurants in Paris, France.  He is the current owner of one half of the shares of stock (250) in the Florida company Chef Vincent, Inc. and is its president.

2

7.     Plaintiff Davey Vujasin is a citizen of France with an address of le Capitole B 415 Blvd. d' Alger, Frejis, 83600 France.  He is the current owner of one half of the shares of stock (250) in the Florida company Chef Vincent, Inc. and is its vice-president.

8.     Defendant Chef Vincent, Inc. is a Florida corporation incorporated on March 7, 2007, with its principal place of business at 736 Ocean Drive, Miami Beach, Florida.  Chef Vincent, Inc. is engaged in the operation and management of a restaurant called "Chef Vincent" at the same address.  As explained more fully below, Chef Vincent, Inc. was sold by its sole shareholder, Defendant Vincent Thilloy, on October 30, 2007 to the Plaintiffs.  Plaintiffs now own Chef Vincent, Inc.   Plaintiffs sue Chef Vincent, Inc. only in its corporate structure prior to its sale to Plaintiffs.

9.     Defendant Vincent Thilloy resides at 3322 Chase Avenue, Miami Beach, Florida 33139.  On March 9, 2007, Defendant Thilloy created Chef Vincent, Inc. under Florida law.  Until October 30, 2007, Defendant owned all of the outstanding shares of stock (500 shares) of Chef Vincent Inc. and was its president, secretary, treasurer and sole director.

### FACTUAL BACKGROUND

10.     The Colony Hotel South Beach is located at 736 Ocean Drive, Miami Beach, Florida 33139. It is in the heart of Miami's Art Deco District across from beautiful South Beach. According to the Colony Hotel's website: "This hotel is the perfect spot for romance, excitement and fun in the sun. The Colony is close to fine and casual dining, clubs and shops, and is just 10 minutes from the Port of Miami, 15 minutes from Miami International Airport and within walking distance to the Miami Beach Convention Center."  The Colony Hotel South Beach is owned by Colony Hotel, LLC.

11.     Prior to March 7, 2007, the Colony Hotel operated a restaurant on its premises that it called the "Colony Café."

12.     On March 7, 2007, Colony Hotel, LLC decided to lease its restaurant to Defendant Thilloy to manage and operate.  Specifically, the Colony Hotel, LLC entered into a

3

lease with Defendant Thilloy covering the first floor of the Colony Hotel together with areas necessary to access it and the personal property located at the leased premises set forth in a list of inventory attached as Exhibit B to the lease.  A true and correct copy of the lease is attached as **Exhibit 1**.  Defendant Thilloy was entitled to use the leased premises and personal property to operate the restaurant on the premises.  In consideration for the leased premises, Thilloy was required to pay rent in the approximate amount of $22,000.00 per month to the Colony Hotel, LLC and pay the one time amount of $300,000 for leasing "certain equipment, furnishings, fixtures, and improvements."  Article 3.9 of Lease.

13.    Shortly after leasing the restaurant, Defendant Thilloy changed the name of the restaurant from the "Colony Café" to "Chef Vincent."

14.    On March 9, 2007, Defendant Thilloy created Chef Vincent, Inc. to own, operate, and manage Chef Vincent restaurant under Florida law.   According to the Articles of Incorporation, Chef Vincent Inc. was authorized to issue 500 shares of stock with a par value of a $1.00.

15.    On April 12, 2007, Defendant Thilloy assigned the Lease to Chef Vincent, Inc. with the consent of Colony Hotel, LLC. A true and correct copy of the Assignment is attached as **Exhibit 2.** Defendant Thilloy was the then president and sole shareholder in Chef Vincent, Inc.

16.    Sometime prior to October 12, 2007, Defendant Thilloy approached Laurent Benzaquen, a real estate agent with Barclay's Real Estate Group, LLC ("Barclay's Real Estate"), to serve as his real estate agent to sell "Chef Vincent Restaurant" by way of a stock sale of Chef Vincent Inc.  Chef Vincent Restaurant could not be sold by way of a recorded transfer of deed in the real property because, as detailed below, Chef Vincent Inc. and Defendant Thilloy never owned outright any real or personal property constituting a physical restaurant, but rather possessed a 10-year lease to use the property.

17.    At about the same time, Plaintiffs, French nationals, were interested in owning a business in the United States that would permit them and their family members to reside in the

4

United States for a limited time and purpose in accordance with U.S. E-2 (nonimmigrant treaty trader/investor) visa requirements. The Plaintiffs engaged Benzaquen as their real estate agent to scout for and to assist in the purchase of a restaurant in Miami Beach. The Plaintiffs do not speak English, only French and were unfamiliar with U.S. business practices. Benzaquen and Thilloy spoke (and speak) French. Plaintiffs, therefore, heavily depended upon, trusted and relied upon their fellow French compatriots.

18.     In early October 2008, Benzaquen showed to the Vujasins a "pocket listing" he had from Defendant Thilloy for the "Chef Vincent" restaurant at the Colony Hotel. A "pocket listing" is a property that is for sale, but the fact of which has not been made public and listed on any service. Benzaquen represented that Defendant Thilloy would sell the restaurant to Plaintiffs for $1 million. Plaintiff Jean-Marc Vujasin asked Benzaquen for Chef Vincent's financial statement to support the asking price. In response, Benzaquen told Plaintiff "that it does not work that way here [in the United States]." Benzaquen, acting on behalf of Defendant Thilloy, told Plaintiffs that since the Chef Vincent restaurant was a "pocket listing," that "they should not talk to anyone about the restaurant, but should buy it quickly, before others learn of it and jump on it."

19.     Benzaquen subsequently told Plaintiffs that Defendant Thilloy and Chef Vincent, Inc. would agree to reduce the sales price for the restaurant to $800,000 and that they "would not find anything less than $800,000 on Ocean Drive."

20.     Benzaquen and Thilloy provided the Plaintiffs with a tour of the physical premises of the restaurant. During the tour, Plaintiff Jean-Marc Vujasin asked Defendant Thilloy as to what equipment and inventory was included in the purchase price and in response Defendant Thilloy provided Plaintiffs with a list of equipment, a copy of which is attached hereto as **Exhibit 3.** Unknown to Plaintiffs at the time, the list Defendant Thilloy provided to Plaintiffs was the same as the list of equipment that had been leased by Defendant Thilloy from the Colony Hotel, LL and which was attached as Exhibit "B" to the Lease.

5

21.     Defendant Thilloy told the Plaintiffs that Chef Vincent, Inc. was selling all of the equipment, furniture, computers, flat screen televisions, kitchen equipment, personal property on the premises, and liquor license to the buyer.

22.     During the tour, Defendant Thilloy also told the Plaintiffs that he would replace all of the kitchen equipment, including the oven, fryer, and grill, at a cost of approximately $15,000, to induce Plaintiffs to purchase Chef Vincent, Inc.

23.     Based upon these foregoing representations and the representations made in the Purchase Agreement detailed below, the Plaintiffs agreed to purchase the stock of Chef Vincent, Inc., the owner of the restaurant, for $800,000.  Plaintiffs agreed to pay $400,000 in cash and to execute a promissory note in favor of Defendant Thilloy for the remaining $400,000.

24.     Benzaquen, the real estate agent, then steered the Plaintiffs to attorney Dennis R. Bedard, Esquire whose office was across the hall from that of Barclay's Real Estate office, to serve as the attorney for the Plaintiffs and Thilloy to close the sale for all parties.  *See* Letter of Dennis Bedard, Esquire attached as **Exhibit 4.**  Defendant Bedard drafted for Defendant Thilloy an Agreement for Purchase and Sale of Assets, a Bill of Sale, a $400,000.00 Promissory Note, and a $44,000.00 Promissory Note.

25.     On October 12, 2006, the Plaintiffs and Defendant Thilloy executed the "Agreement for Purchase and Sale of Assets."  A true and correct copy is attached as **Exhibit 5.**  Pursuant to Section E(1) of the Agreement, the "Seller agree[d] to sell and the Buyer agree[d] to buy:"

> [a]ll of the outstanding shares of the company, including but not limited to all goodwill, **equipment**, stock in trade, receivables incurred following closing, **licenses, fixtures, furnishings, equipment and machinery located at the premises or used in connection with the operation of the business, together with any rights to the Lease Agreement,** wholly or partially described in Exhibit A. . .

Emphasis added.

6

26.     Pursuant to Section E(8), Defendant Thilloy further represented and warranted that

> **[a]ll machinery and equipment is owned by Seller and not leased from any third party.** Said machinery is free and clear of any debts. Seller will provide an Affidavit of No Liens at time of closing. . .

Emphasis added.

27.     Finally, pursuant to Section E(9), Defendant Thilloy represented and warranted that "**Seller is the owner of and has good and marketable title to the business and property described in paragraph 1, free from all debts, liens, and security interests and encumbrances** . . ." Emphasis added.

28.     These representations were false and were known by Defendant Thilloy to be false at the time that he made them.  Neither Defendant Thilloy nor Chef Vincent Inc. ever owned the equipment located on the leased premises and that it sold to Plaintiffs.  Defendant Thilloy and Chef Vincent, Inc, had leased that equipment from Colony Hotel, LLC. in March 2007 for $300,000 and Chef Vincent, Inc. was not, therefore, lawfully able to sell and to transfer legal title in the equipment to the Plaintiffs.  Defendants Thilloy and Chef Vincent, Inc. artificially inflated the sales price of the stock by $300,000.00 by including the leased equipment as part of the assets of Chef Vincent Inc.

29.     Defendant Thilloy further warranted in Section E(9)(j) of the Agreement that "[a]ll equipment, fixtures, furnishings and machinery are being sold in **good working conditions**. Buyer shall have (5) days from the execution of this agreement to make any inspection it deems necessary."  Defendant Thilloy orally had represented to the Plaintiffs that he would replace all of the kitchen equipment, at a cost of approximately $15,000, to induce Plaintiffs to purchase Chef Vincent, Inc.  He has not done so.  One oven in particular was not working at closing. Defendant Thilloy did purchased a used oven for $1500.00 from a restaurant supply store – however, that oven broke shortly after it had been installed.

7

30.    Pursuant to paragraph E(9)(o), Defendant Thilloy also represented and warranted that Chef Vincent, Inc. "holds all city, county and state permits and **licenses for the operation of the business**, including a current certificate of use and occupancy." In particular, Defendant Thilloy told the Plaintiffs that he was selling and they were purchasing the 4COP liquor license (with an approximate value of $100,000) for the restaurant as part of the sales price. This representation was false. According to Article 12 of the Lease between the Colony Hotel, LLC and Thilloy/Chef Vincent Inc., the Hotel "owns the existing liquor license which licensee may use in connection with his restaurant so long as Lessee complies with all applicable rules. . . " Chef Vincent, Inc. did not own the liquor license and, therefore, could not sell it to the Plaintiffs.

31.    On October 30, 2007, Defendant Thilloy signed a Bill of Sale in the amount of $800,000 for "one hundred percent of his shares and ownership interest in Chef Vincent, Inc." Bedard and Benzaquen served as the witnesses to the execution of the document. See **Exhibit 6.**

32.    In reliance upon the representations made in the Purchase Agreement, on October 30, 2007, the Plaintiffs paid Defendant Thilloy $400,000 in cash and signed a Promissory note in the amount of $400,000 payable as follows:

        a.  $50,000.00 within six months of the signing of this note; and

        b.  $350,000.00 payable within four years of the date of this note with no interest for the first two years and 5% annual interest for the remaining two years.

See **Exhibit 7.**

33.    The Promissory Notes were secured by a Security Agreement signed by the Plaintiffs on October 30, 2007 and witnessed by Bedard and Benzaquen.  In the event Plaintiffs default on their Promissory Notes, the Security Agreement permits Defendant Thilloy to cause to transfer one-half of the Chef Vincent stock back to him. See **Exhibit 8**.

8

34.     Defendant Thilloy did not disclose to Colony Hotel, LLC his sale of "Chef Vincent Restaurant." Instead, he actively concealed the sale so as not to alert Colony Hotel, LLC to his conversion of the Hotel's personal property to his use and its sale.

35.     After taking possession of the restaurant in November 2007, Plaintiffs discovered that Chef Vincent did not have $250,000 in inventory (consisting of liquor and food) that Defendant Thilloy had represented to them would be left there, but rather $12,450 in inventory.

36.     In January 2008, Plaintiffs discovered that they had been scammed by their French comrade and his accomplices. When the Colony Hotel, LLC management saw that the Plaintiffs were operating the restaurant on its premises, the Hotel's owner obtained a copy of the Purchase Agreement. Since Defendant Thilloy had not sought and obtained from Colony Hotel LLC prior approval for the sale of the restaurant Lease to Plaintiffs and the Purchase Agreement purported to transfer title of the equipment to the Plaintiffs, the Colony Hotel, LLC demanded Defendant Thilloy to sign a personal guarantee for the Plaintiffs' performance under the Lease and an Affidavit acknowledging that the sale did not include the equipment that had been leased to Defendant Thilloy. See Colony Hotel LLC Documents Directed to Thilloy attached as **Exhibit 8.**

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF 10(b) OF THE EXCHANGE ACT, 15 U.S.C. § 78j(b) AND SEC RULE 10b-5, 17 C.F.R. 240.10b-5
(Plaintiffs v. All Defendants)

37.     Plaintiffs reallege paragraphs 1 through 36 above as if set out in full.

38.     This count is brought by Plaintiffs against Defendants in connection with the fraudulent conduct and misrepresentations that caused Plaintiffs to enter into the "Agreement for Purchase and Sale of Assets" ("Stock Purchase Agreement") on October 12, 2007, with Defendant Vincent Thilloy. Plaintiffs tendered valuable consideration in connection with the Stock Purchase Agreement in the amount of $800,000 (by cash and promissory note) to which

9

they are entitled to be reimbursed and repaid due to the fraud *ab initio*, which voids the Agreement and entitles them to rescission and other appropriate relief. Alternatively, Plaintiffs are entitled to retain ownership of Chef Vincent, Inc. but receive compensatory and punitive damages in the differential amount that they have suffered.

39.     Pursuant to Section 3(a)(13) of the Exchange Act, 15 U.S.C. §78c(a)(13), the term "purchase" includes any contract to purchase a "security," and pursuant to Section 3(a)(14) of the Exchange Act, 15 U.S.C. §78c(a)(14), the term "sale" includes any contract to sell or otherwise dispose of any security. The Stock Purchase Agreement involves the purchase and sale of securities within the meaning of the Federal securities laws, and all of the Defendants' misrepresentations, omissions and fraud schemes were made in connection with the purchase and sale of securities.

40     From at least October 2007, through the present, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder, in that, by use of the mails and facilities of interstate commerce, in connection with the purchase and sale of the securities, these Defendants:

        a.     employed schemes, devices and artifices to defraud;

        b.     made untrue statements of material fact and/or omitted to state material facts or to state facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the Plaintiffs;

        c.     Engaged in acts, practices and a course of business which operated or would operate as a fraud and deceit upon Plaintiffs.

41.     Defendants made the false representations set out in paragraphs 18,19, 20, 21, 22, 25, 26, 27, 29, 30 and 35.

42.     The activities of Defendants in representing and warranting that the then Chef Vincent, Inc. owned and was selling property to which it did not hold title to inflate the value of the stock to $800,000.00 are schemes, devices and artifices to defraud within the meaning of SEC Rule 10b-5(1), as well as acts, practices and a course of business which operated as a

10

fraud and deceit upon the Plaintiffs, within the meaning of SEC Rule 10b-05(3). The blatantly false overstatement of assets and the omission to disclose the actual financial condition of the then Chef Vincent restaurant violates SEC Rule 10b-5(2).

43.     The purpose and effect of these fraudulent acts, schemes, misrepresentations, omissions, and deceptive courses of conduct by the Defendants – which were part of a continuing and common scheme and conspiracy by the Defendants with as of now unnamed co-conspirators to defraud the Plaintiffs – were to induce Plaintiffs to believe that Chef Vincent, Inc. had assets greater than it did, and at least worth $800,000, thereby inducing Plaintiffs to proceed with the fraudulently induced sale.

44.     Plaintiffs' reliance – upon the misstatements and omissions by the Defendants, and this deceptive conduct – was reasonable under the circumstances.

45.     This action is brought well within one year of the discovery of the untruth of the misrepresentations, the misleading statements and the revelation of the Defendants' deceptive conduct; and Plaintiffs, within the exercise of due diligence, could not have discovered such misrepresentations earlier, particularly in light of Defendants' deliberate concealment. Not until January 2008 did Plaintiffs become aware that the Defendants had perpetrated a deliberate fraud upon Plaintiffs in connection with the Stock Purchase Agreement and Plaintiffs' purchase of Defendants' securities.

46.     As a direct and proximate result of the wrongful conduct of the Defendants, the Plaintiffs have been injured, and have sustained significant damages in connection with the stock purchase.

47.     Each of such Defendants knowingly and substantially participated in the violations of Rule 10b-5 by making misrepresentations and misleading statements or condoning of the same in their presence; by drafting, reviewing and/or approving the false Purchase Agreement and Bill of Sale – all in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b); and SEC Rule 10b-5(1), (2) and (3), 17 C.F.R. §240.10b-5(1), (2), and (3).

11

## COUNT II

### CONTROLLING PERSON LIABILITY UNDER SECTION 20(a)
### OF THE EXCHANGE ACT, 15 U.S.C. §78t(a)
(Plaintiffs v. Defendant Thilloy)

48.　Plaintiffs reallege paragraphs 1 through 47 above as if set out in full.

49.　While acting as an officer, director, and controlling shareholder of Chef Vincent, Inc., Defendant Thilloy possessed the power to direct, or cause the direction of Chef Vincent, Inc., its management, operations, business and policies, and the conduct of its agents. Defendant Thilloy exercised such powers.　Accordingly, defendant Thilloy was a "controlling person" of Chef Vincent, Inc.

50.　Defendant Thilloy violated Section 10(b) of the Exchange Act, and SEC Rule 10b-5, promulgated thereunder.

51.　Defendant Thilloy knew, or was severely reckless in not knowing, of the primary violations by Chef Vincent, Inc. of Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder.

52.　As a controlling person of Chef Vincent, Inc. under Section 20(a) of the Exchange Act, and as an officer and/or director of Chef Vincent, Inc., Defendant Thilloy.

### COUNT III

### VIOLATION OF SECTION 517.301 OF THE FLORIDA
### SECURITIES AND INVESTOR PROTECTION ACT
(Plaintiffs v. All Defendants)

53.　Plaintiffs reallege paragraphs 1 through 36 above as if set out in full.

54.　This count is brought against all Defendants, pursuant to Fla. Stat. §517.211.

55.　From at least September 2007, through the present, Defendants violated the Florida Securities and Investor Protection Act, Fla. Stat. §517.301, in connection with the Stock Purchase Agreement whereby Defendants fraudulently sold securities of Chef Vincent, Inc. to Plaintiffs, directly and indirectly:

12

a.     engaging in devices, schemes and artifices to defraud Plaintiffs and
       others;

b.     obtaining money and property by means of untrue statements
       of material facts and omitted to state material facts necessary to make
       the statements made, in light of the circumstances under which they
       were made, not misleading; and

c.     engaging in acts, practices and a course of business which operated
       as a fraud and deceit upon Plaintiff in connection with the purchase of
       stock by Plaintiff in Chef Vincent, Inc.

56.    Defendants engaged in such activities to induce Plaintiffs to purchase Chef
Vincent, Inc. based upon misleading and fraudulent financial information.  The Defendants made
material misrepresentations of the financial condition to Plaintiffs orally and in the Stock
Purchase Agreement and engaged in the schemes, devices, and artifices described above in
paragraphs 18,19, 20, 21, 22, 25, 26, 27, 29, 30 and 35.

57.    Pursuant to Fla. Stat. §517.021(16)m the term "sale" means any contract of sale
or disposition of any investment security or interest in a security.  Pursuant to Fla. Stat.
§517.021(17)(v), the term security includes "…any receipt for a security, or for subscription to a
security, or any right to subscribe to or purchase a security."  Plaintiffs' purchase of Chef
Vincent, Inc.'s shares, pursuant to the Stock Purchase Agreement and Bill of Sale, involves the
purchase and sale of securities within the meaning of Florida law.

58.    Plaintiffs relied upon the misstatements and omissions by the Defendants.
Plaintiffs' reliance was reasonable under the circumstances, and the nature of the Defendants'
wrongful conduct could not have been discovered by the Plaintiffs through the exercise of due
diligence.

59.    By virtue of the wrongful acts of the Defendants, Plaintiffs have been injured in
connection with the purchase of stock in Chef Vincent, Inc.

60.    Every sale made in violation of Fla. Stat. §517.301 may be rescinded at the
election of the purchaser, as provided in Fla. Stat. §517.211.  Alternatively, Plaintiffs are entitled

13

to retain ownership of Chef Vincent, Inc. but receive compensatory and punitive damages in the differential amount that they have suffered.

61.     In the event the Court determines that any Defendant is not within the scope of liability under Fla. Stat. §517.211, the Plaintiffs seek relief under Fla. Stat. §517.241.

## COUNT IV

### BREACH OF CONTRACT
(Plaintiffs v. All Defendants)

62.     Plaintiffs reallege paragraphs 1 through 36 above as if set out in full.

63.     Plaintiffs and Defendants entered into a Stock Purchase Agreement in which Plaintiffs agreed to purchase all of the stock of Chef Vincent, Inc. in consideration for certain representations and warranties.

64.     Defendant Thilloy's representations and warranties on behalf of Chef Vincent, Inc. included those set forth above in paragraphs 25, 26, 27, 29 and 30.

65.     Defendants' representatives and warranties are untrue and, therefore, Defendant Thilloy is in breach of the Stock Purchase Agreement.

66.     Plaintiffs demand damages in the amount that the value of the stock was artificially inflated by Defendants by basing it on assets that Chef Vincent, Inc. did not own or possess.

## COUNT V

### COMMON LAW FRAUD
(Paintiffs v. All Defendants)

67.     Plaintiffs reallege paragraphs 1 through 36 above as if set out in full.

68.     The Defendants made misstatements of material fact which they knew were false when made, or under circumstances in which they should have known such misstatements to be false at the time they were made. The Defendants also omitted to state material facts known to them under circumstances in which they had a duty to speak. These misrepresentations included the representations in the Stock Purchase Agreement referenced in paragraphs 28

14

through 33 above and that the assets of Chef Vincent, Inc. had a value of $800,000 were accurate; the omission that Chef Vincent Inc. did not have title to $300,000 of leased equipment and a $100,000 liquor license; and that Defendant Thilloy would replace the kitchen equipment.

69.    Defendants made their misstatements and omissions with the intent that Plaintiffs would rely thereon in considering, and eventually approving, the Stock Purchase.

70.    The Plaintiffs, in reliance upon the misrepresentations and omissions made by the Defendants, were defrauded and sustained significant damages.

71.    The acts of the Defendants were willful, wanton, malicious, and in reckless disregard for the truth, welfare and well-being of the Plaintiffs.  Due to the intentional and willful conduct of the Defendants, Plaintiffs are entitled to cancel and rescind the Stock Purchase Agreement.  Alternatively, Plaintiffs are entitled to retain ownership of Chef Vincent, Inc. but receive compensatory and punitive damages in the differential amount that they have been defrauded.

### COUNT VI

### VIOLATION OF FLA. STAT. §812.014 and 772.11 – CIVIL THEFT
(Plaintiffs v. All Defendants)

72.    Plaintiffs reallege paragraphs 1 through 36 above as if set out in full.

73.    On May 23, 2001, Plaintiffs made demand to Defendant Chef Vincent, Inc. and Defendant Thilloy for the return of all property stolen pursuant to Florida's Civil Theft Statute.

74.    Defendants knowingly and willfully obtained, used and/or converted, with the intent to deprive, both temporarily and permanently, the property of Plaintiffs, in violation of Fla. Stat. §812.014, by causing the theft and misuse of at least $400,000 (and $400,000 by way of a promissory note), which was paid by Plaintiffs for assets that were not owned by Chef Vincent, Inc.

15

## COUNT VII

### DECLARATORY JUDGMENT
(Plaintiffs v. All Defendants)

75.     Plaintiffs reallege paragraphs 1 through 36 above as if set out in full.

76.     Plaintiff and Defendants have a present, actual and bona fide dispute as to their respective rights to a security deposit paid by Defendant Chef Vincent Inc. and Defendant Thilloy to the Colony Hotel, LLC prior to the Stock Purchase.

77.     Defendant Thilloy had paid the Colony Hotel a $44,000 security deposit. Section E(3) of the Stock Purchase Agreement states that "Seller agrees that Buyer will re-imburse him for the security deposit ($44,000) held by landlord four years from the date of closing."

78.     However, the buyers, Plaintiffs, no where agreed to reimburse Defendant Thilloy $44,400 for a security deposit and it is of no relevance to Plaintiffs that the "Seller" may have agreed to such reimbursement when the Buyer did not.  To the contrary, Section E(1) of the Agreement states that "[a]ll security deposits currently held by landlord ... are included in sale price." The return of the security deposit was covered in the $800,000 paid by Plaintiffs.

79.     Plaintiffs require a declaration to ascertain their obligation to pay the security deposit.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs Jean-Marc and Davy Vujasin request that the Court enter a final judgment as follows:

(a)     With respect to Count I (violations of 10(b) of the Exchange Act and Rule 10b-5), enter a judgment against Defendants Chef Vincent, Inc. and Thilloy for compensatory damages, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems appropriate and just;

(b)     With respect to Count II (Section 20(a) controlling person liability), enter a judgment against Defendant Thilloy for compensatory damages, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems appropriate and just;

(c)     With respect to Count III (violations of Section 517.301 of FSIPA), enter a judgment against Defendants Chef Vincent, Inc. and Thilloy for compensatory damages, costs, pre-judgment and post-judgment interest, and attorneys fees, pursuant to Fla. Stat. §517.211(6), and such other relief as the Court deems appropriate and just;

(d)     With respect to Count IV (breach of contract), enter a judgment against Defendants Chef Vincent, Inc. and Thilloy for compensatory damages, costs, pre-judgment and post-judgment interest, and such other relief as the Court deems appropriate and just;

(e)     With respect to Count V (common law fraud), enter a judgment against Defendant Chef Vincent Inc. and Defendant Thilloy for compensatory damages, costs, pre-judgment and post-judgment interest, punitive damages and such other relief as the Court deems appropriate and just;

(f)     With respect to Count VI (civil theft), enter a judgment against Defendants Chef Vincent, Inc. and Thilloy for compensatory damages consisting of the property taken or caused to be taken by each of them (over $400,000), treble damages as provided by statute ($1.2 million), such lawful interest thereon, plus attorneys' fees and costs, trebled, and such other relief as the Court deems appropriate and just; and

(g)     With respect to Count VII (declaratory judgment), enter a judgment against Defendant Thilloy declaring that Plaintiffs have no legal obligation to pay Defendant Thilloy for the security deposit ($44,000).

_____
SCOTT A. BURR, P.A.
Florida Bar No. 0099325
407 Lincoln Road, Penthouse SE
Miami Beach, Florida 33139

17

Tel: (305)534-4757
Fax: (305)538-5504
e-mail: scottaburr@bellsouth.net

*Counsel for Plaintiffs*
*Jean Marc and Davey Vujasin*

DATED:  July 18, 2008

18

# EXHIBIT 1

## LEASE AGREEMENT

LEASE AGREEMENT ("Lease") made as of the __ㄱ__ day of March, 2007, by and between **COLONY HOTEL, LLC**, a Florida limited liability company (hereinafter called "Lessor"), and **VICENT THILLOY** (hereinafter called "Lessee").

## ARTICLE 1
## LEASED PREMISES

In consideration of the rents, covenants and agreements hereinafter reserved and contained on the part of Lessee to be observed and performed, Lessor demises and leases to Lessee, and Lessee rents from Lessor (i) those certain premises on the first floor of the Colony Hotel containing 3,200 square feet, plus or minus, together with areas necessary to access same, located in the Colony Hotel (the "Hotel" or "Building"), at 736 Ocean Drive, Miami Beach, Florida (the "Leased Premises"), and (ii) the personal property located at the Leased Premises to be set forth in a list of inventory to be agreed upon between the parties within seven (7) days from the date hereof and which will be subsequently attached to this lease as Exhibit "B" (the "Personalty").

Lessee shall have the ability at Lessee's own cost to establish outdoor café sidewalk seating in front of the Colony Hotel on Ocean Drive through the City of Miami Beach. Lessee shall be responsible for the purchase, maintenance and upkeep of all awnings. Lessee's awnings, furniture and outdoor seating shall be approved by the City of Miami Beach and Lessor.

## ARTICLE 2
## GRANT AND TERM

2.1 <u>Term</u>. The Leased Premises are leased by Lessor to Lessee for a term (the "Term") of Ten (10) years, commencing as of March 8, 2007 ("Commencement Date") and ending on February 28, 2017, unless sooner terminated pursuant to the terms hereof.

2.2 <u>Leased Year Defined</u>. The term "Lease Year" as used herein shall mean the yearly period beginning on the Commencement Date and each annual anniversary of said date thereafter.

2.3 <u>Option to Renew</u>. So long as Lessee is not in default under the terms and conditions of this Lease, Lessee shall have the option to renew this Lease for one additional five (5) year term at a rental to be agreed upon by the parties at the time of the exercise of the option. Lessee shall give Lessor written notice, by Certified Mail, Return Receipt Requested, to the Lessor on or before 180 days prior to the end of the initial term on this Lease.

## ARTICLE 2
## RENT

3.1 <u>Base Rent</u>. Lessee covenants to pay to Lessor at the address of Lessor set forth in Section 24.7 hereof, or at such other place designated by Lessor, without any prior demand therefor and without any deduction or setoff whatever, fixed "Base Rent," as follows:

    a.    Base Rent for the first lease year will be $22,200 per month; and



b.    Base Rent for each additional year of the term of this Lease will increase by four (4%) percent per annum.

Base Rent shall be paid monthly, in advance, on the first day of each month, except that Base Rent for the first calendar month and Security Deposit as set forth in Article 7 of this Lease, shall be paid upon execution of this Lease.

3.2    Lessee shall pay Percentage Rent computed in accordance with this Paragraph, plus applicable sales and use taxes thereon.

(a)    Gross Sales; Percentage Rent; Breakpoint.

(i)    <u>Definition of Gross Sales</u>. "Gross Sales" means the total gross receipts of Lessee or any sublessee, licensee or concessionaire in, at, from, or arising out of the use of, the Premises, whether wholesale or retail, whether for cash or credit, or otherwise, and including the value of all consideration other than money received, without reserve or deduction for inability or failure to collect, including, but not limited to, receipts from: (1) sales originating in, at, from or arising out of the use of the Premises, whether delivery or performance is made from the Premises or from some other place and regardless of the place of bookkeeping for payment of, or collection of any account; (2) sales made or performed by mail, telephone, e-mail/internet, or telecopy orders received or filled in, at or from the Premises; (3) telephones and mechanical or other vending devices in the Premises (provided that for purposes of determining Gross Sales from such devices the costs of leasing and licensing such devices shall be subtracted therefrom); and (4) sales which Lessee, or any sublessee, licensee or concessionaire in the normal and customary course of its business would credit or attribute to its operations at the Premises or any part thereof. Any deposit accepted and retained by Lessee shall be included in Gross Sales. Each installment or credit sale shall be treated as a sale for the full price which such sale is made, irrespective of whether or when Lessee receives payment therefor. No franchise tax, capital stock tax, tax based upon assets or net worth or gross receipt tax, and no income or similar tax based on income or profits shall be deducted from Gross Sales.

(ii)    <u>Exclusions from Gross Sales</u>. The following shall be excluded from Gross Sales: (1) cash or credit refunds to customers on transactions previously included in Gross Sales; (2) sales of fixtures, machinery and equipment, which are not stock for sale or trade, after use thereof in the conduct of Lessee's business; (3) amounts collected from customers and paid by Lessee to any government for any sales or excise tax; (4) direct expenses of credit card sales paid by Lessee to the issuers and processors of nationally recognized credit cards; (5) sums and credits received in settlement of claims, including insurance proceeds, for loss of or damage to fixtures, merchandise, or other items of Lessee's property; (6) any sums paid to third parties for the use or rental of pay telephones, stamp machines, music machines or amusement machines; (7) gift certificates, or similar vouchers, until such time as they shall have been converted) into a sale by redemption; (8) vendor discounts, allowances and rebates; (9) rents and fees paid to Lessee by approved sublessee, licensees and/or concessionaires; (10) supplementary services provided at Lessee's cost (such as, but not limited to, special order fees); (11) tax rebates; (12) limited and approved receipts from the sale of meals to employees of the restaurant sold to them in the course of their employment; (13) any service charges made and collected by Lessee and turned over to Lessee's employees in lieu of such employee's receiving tips or gratuities from Lessee's customers; (14) non-food promotional items sold at no profit to Lessee; (15) non-cash donations to nonprofit, charitable or religious organizations; and (16) any penalties or charges imposed by Lessee on its customers for returned checks.

(iii)    <u>Percentage Rent; Breakpoint</u>. The Percentage Rent for any Lease Year will be equal to eight percent (8%) of Gross Sales for the Lease Year in excess of a natural breakpoint (the point at which the Base Rent equals the Base Rent divided by the Percentage Rent; the "Breakpoint"). For example, during the first Lease Year, Percentage Rent shall apply to Gross Sales in excess of $3,330,000 ($266,400/.08=$3,330,000), and for the second Lease Year, Percentage Rent shall apply to Gross Sales in excess of $3,463,200 ($277,056/.08=$3,463,200), and so forth.



Percentage Rent or any portion of a Lease Year shall be prorated by multiplying the Breakpoint by a fraction, the numerator of which will be the number of days of the partial Lease Year during the Lease Term, and the denominator of which will be 365.

(b)    Reporting of Gross Sales; Payment of Percentage Rent. Within twenty (20) days after the end of each month, Lessee shall furnish to Lessor a monthly statement, certified by Lessee, setting forth: (1) the amount of Gross Sales made during such month; and (2) the cumulative Gross Sales made from the beginning of the Lease Year through the end of the month, which statement shall be in a form and style and shall contain such details and breakdowns as Lessor may reasonably provide or reasonably require. In addition, upon written request by Lessor, Lessee shall also provide Lessor with monthly state sales tax reports and Lessee's canceled checks evidencing the payment of any sales taxes pursuant to Lessee's sales tax reports. Upon reaching the Breakpoint as calculated for the given year, Lessee shall deliver to Lessor within thirty (30) days a complete statement, certified by Lessee, showing in detail (as Lessor may reasonably require) the amount of Gross Sales made for the succeeding month, and the amount of Percentage Rent then due Lessor for such month, together with payment thereof, in full, to Lessor and thereafter for each month. If this Lease is terminated prior to the last day of a Lease Year by expiration of the Lease Term or otherwise, the foregoing annual statement shall be furnished within ninety (90) days after the termination of this Lease.

3.3    Rent Tax. In addition to Base Rent, Additional Rent, Percentage Rent and any other sums or amounts required to be paid by Lessee to Lessor pursuant to the provisions of this Lease, Lessee shall also pay to Lessor, simultaneously with the payment of any such rents or other sums or amounts, the amount of any applicable sales, use, or excise tax on any such rents or other sums or amounts related to the Leased Premises levied, imposed or assessed by any governmental authority, and whether charged against Lessee or Lessor.

3.4    Additional Rent. In addition to Base Rent, Percentage Rent and the Rent Tax under Sections 3.2 and 3.3, respectively, Lessee shall pay as "Additional Rent" any and all other sums of money or charges required to be paid by Lessee under this Lease, whether or not the same be specifically designated "Additional Rent". If no express time is provided in this Lease for payment of such amounts or charges, they shall be payable upon the earlier of:  demand by Lessor, or together with the next installment of Base Rent thereafter falling due hereunder, but nothing herein contained shall be deemed to suspend or delay the payment of any amount of money or charge at the time the same becomes due and payable hereunder, or limit any other remedy of Lessor.  Base Rent, Percentage Rent and Additional Rent are sometimes hereinafter jointly and severally referred to as "Rent".

3.5    Past Due Rent. If Lessee shall fail to pay, when the same is due and payable, any Rent Tax or any Rent, including without limitation, any Base Rent, Percentage Rent or Additional Rent, such unpaid amounts shall bear interest from the due date thereof to the date of payment at the rate of eighteen percent (18%) per annum, but in no event more than the maximum rate permitted by law.

3.6    Taxes. In addition to the amounts set forth in this Lease, Lessee shall also pay to Lessor Lessee's Prorata Share of all "Real Estate Taxes" and "Personal Property Taxes" which are levied on any or all of the Building, together with all assessments and City of Miami Beach parking impact fees.  Lessee will begin being responsible for Real Estate Taxes and other items mentioned herein at the beginning of the term of the Lease, and continuing for the full term of the Lease and any renewals thereto.

3.7    Utilities.  Lessee shall be responsible for separately metered electric, gas and water consumption where mechanically possible, and (50%) percent of the garbage and waste removal costs for the Hotel.  Payment shall be made on a monthly bases within seven (7) days of receipt of invoices from Lessor.  Lessee shall pay directly, prior to delinquency or imposition of interest or penalties, all charges for gas and other services for which the Leased Premises are separately billed.  In the event Lessor fails



3

to timely pay charges for electrical, water or sewer services, Lessee may pay same on Lessor's behalf if necessary to avoid service interruption and may offset against Rent the portion of such payment not otherwise payable by Lessee under this Section 3.7. If for any reason it is not possible to separately meter all the above utilities, then those portions not separately metered shall be paid directly to the Lessor by the Lessee based upon the prorata portion of the Hotel leased by the Lessee.

3.8.   <u>Prorata Share</u>.   Lessee shall pay monthly to Lessor its prorata share of property taxes, lobby cleaning, and property insurance estimated for the first year of this Lease to be $3,800.00 per month.   These operating expenses shall be paid simultaneously with the monthly payment of rent.

3.9   <u>Additional Payment</u>.   In addition to the above rent, and in consideration of the Lessee's right to use certain equipment, furnishings, fixtures, and improvements of Lessor, Lessee shall pay to Lessor upon execution of this Lease the sum of $300,000.00, which shall not be refundable.

## ARTICLE 4
## AS-IS CONDITION OF LEASED PREMISES

4.1   Lessee is completely familiar with the condition of the Leased Premises and the Personalty and hereby agrees to take the Leased Premises and the Personalty in "as is condition.   Lessor represents and warrants to Lessee that Lessor has not received any notice from any governmental authority or agency of any violation or alleged violation of any laws, rules, regulations, or other restrictions of any governmental authority relating to the Leased Premises.   Lessor shall have no obligation to decorate, alter, repair or improve the Leased Premises or the Personalty, as the case may be.   Lessee agrees that no representations respecting the condition of the Leased Premises and no promises to decorate, alter, repair or improve the Leased Premises, either before or after the execution hereof, or any other representations of any nature whatsoever, have been made by Lessor or its agents to Lessee.

## ARTICLE 5
## CONDUCT OF BUSINESS BY LESSEE

5.1   <u>Use of Premises</u>.   Lessee shall use the Leased Premises solely for the purpose of operating a high end restaurant in accordance with Section 5.2 below and the other applicable terms and provisions of this Lease.   Lessee shall conduct such business continuously in the Leased Premises and shall not use, or permit or suffer the use of, the Leased Premises for any other businesses or purpose.   Lessor agrees to cause the Hotel to be continuously operated during the Lease Term, except for closings necessitated by damage, renovations, repairs, termite extinguishment or other necessary reasons.

5.2   <u>Operation of Business</u>.   Lessee shall operate on the Leased Premises a high end restaurant in a manner consistent with the practices of first class restaurants in the Miami Beach area, the concept of which to be approved and consented to by Lessor.   Recognizing that the Leased Premises are part of the Hotel, Lessee shall provide food and beverage service to guests of the Hotel and their invitees.   Lessee shall provide breakfast service, lunch, dinner and room service with minimum operating hours from 8:00 a.m. until 12:00 a.m. seven (7) days a week, 52 weeks a year.

5.2.1 Lessee shall not use any live entertainment (including, without limitation, disc jockey) on the Leased Premises without the prior written approval of the Lessor, which may be arbitrarily withheld.   Entertainment in the form of music shall be permitted at levels approved by Lessor which do not interfere with the operation of the Hotel.



4

5.2.2  Lessee shall maintain a level of tidiness and cleanliness consistent with the highest quality of hotel restaurants.  Without limiting the foregoing, the Leased Premises shall be cleaned and reset immediately after each meal.

5.2.3  Lessee shall place all restaurant refuse in closed containers which shall be placed in the proper areas for sanitation collection outside of the Leased Premises designated by Lessor.  Lessee shall be responsible for payment of the cost of refuse collection, and for compliance with all of the rules, regulations and laws of the City of Miami Beach.

5.2.4  Lessee recognizes that its use and operation of the Leased Premises must be harmonious with the operation of the Hotel.  Therefore, without limiting any other requirements in this Lease, Lessee covenants with Lessor that Lessee shall use and operate the Leased Premises in a manner which will not interfere with, or in any way be detrimental to, the operation of the hotel, and Lessee shall, to the fullest extent possibly, cause its operation to be harmonious with the operation of the Hotel.  If Lessor determines that any activity of Lessee interferes with the operation of the Hotel, Lessee shall immediately cease such activity upon notice from Lessor.

## ARTICLE 6
## OPERATION OF CONCESSIONS

6.1  Lessee shall not permit any business to be operated in or from the Leased Premises by any concessionaire, licensee or sublessee without the prior written consent of Lessor, which may be given or withheld in Lessor's sole discretion.

## ARTICLE 7
## SECURITY DEPOSIT

7.1  <u>Security Deposit</u>.  Concurrently with its execution of this Lease, Lessee shall deposit with Lessor the sum of $44,400.00 (the "Security Deposit"), which sum shall be retained by Lessor as security for the payment by Lessee of Base Rent and all other payments herein agreed to be paid by Lessee, and for the faithful performance by Lessee of the terms and provisions of this Lease.  It is agreed that Lessor, at Lessor's option, may at the time of any default by Lessee under any of the terms or provisions of this Lease, apply the Security Deposit or any part thereof towards the payment of Base Rent and all other sums payable by Lessee under this Lease, and towards the performance of each and every one of Lessee's obligations under this lease (and Lessor shall notify Lessee of such application when made by Lessor), but such obligations and Lessee's liability under this Lease shall thereby be discharged only pro tanto and Lessee shall remain liable for any amount that such shall be insufficient to pay as well as the immediate repayment back to Lessor; that Lessor may exhaust any and all rights and remedies against Lessee before resorting to said sum, but nothing herein contained shall require or be deemed to require Lessor to do so; that, in the event the Security Deposit shall not be utilized for any such purposes, then such deposit shall be returned by Lessor to Lessee within fifteen (15) days next after the expiration of the Term of this Lease.  Lessor shall not be required to pay Lessee any interest on the Security Deposit nor to maintain the Security Deposit in a separate account.

## ARTICLE 8
## ALTERATIONS, FIXTURES, SIGNS AWNINGS AND CANOPIES

8.1  Alterations.  Lessee shall not make any alterations, decorations, installations, improvements or additions ("Alterations") to any portion of the Leased Premises (or the sidewalk outside the Leased Premises) without: the prior written, approval of Lessor, which approval shall not be unreasonably withheld. If Lessee desires to make Alterations and to obtain Lessor's approval therefor, Lessee shall first furnish to Lessor plans and specifications for Lessor's approval, together with such



5

other information as Lessor may require. As a condition to Lessee's approval, Lessor may require that all contracts be approved by Lessor and that all contracts involving $25,000 or more be supported by a payment and performance bond for the contract amount, under which Lessor is named as a dual obligee. Any such, Alterations shall become the property of Lessor upon expiration of this Lease, and shall remain upon, and be surrendered with: the Leased Premises, as a part thereof, at the end of the Term, 'unless Lessor elects otherwise and so notifies Lessee. Lessee shall not have the right to make any alterations to the exterior of the Leased. Premises. Prior to commencing any work, Lessee shall provide to Lessor copies of all government permits necessary for such work to be lawfully done. Lessee must use licensed interior, decorator or architect to make any alterations.

8.2    Fixtures and Surrender of Premises. All fixtures or equipment and other real estate improvements placed by Lessee shall be left on the Leased Premises in the same condition as that, required to be maintained by Lessee during the term of this Lease. Any fixtures, equipment, decorations, canopies, and other property placed on the Leased Premises by Lessee to replace, or to improve upon, existing items and which are integral to the physical appearance or operation of the Leased Premises may not be removed by Lessee upon expiration or termination of this Lease. Anything left on the Leased Premises after the expiration or other termination of this Lease shall be presumed to have been conveyed by Lessee to Lessor under this Lease as a Bill of Sale without further payment or credit by Lessor to Lessee. All costs for repairing any damage caused by Lessee, other than normal wear and tear, shall be the liability of Lessee and shall be paid to Lessor by Lessee upon demand by Lessor.

8.3    Signs Awnings and Canopies. Lessee will not place or suffer to be placed or maintained on any exterior door, wall or window of the Leased Premises any sign, awning or canopy, or advertising matter or other thing of any kind, and will not place. or maintain any decoration, lettering or advertising matter on the glass of any window or door of the Leased Premises without first obtaining Lessor's written approval and consent, which approval shall not be unreasonably withheld or delayed. Lessee shall be allowed, at its own expense, to erect a sign at a place pre-agreed to between Lessor and Lessee's all within the applicable codes and ordinances of the City of Miami Beach. Lessee shall not have the right to place any signage or decorations in any exterior window. Lessee further agrees to maintain such sign, awning, canopy, decoration,, lettering advertising matter or other thing as may be approved in good condition and repair at all times. All in compliance with the applicable codes and ordinances of the City of Miami Beach.

8.4    Discharge of Liens by Lessee. Lessee agrees to pay promptly for any work done or material furnished in or about the Leased Premises. Lessee will not permit or suffer any lien to attach' to the Leased Premises, and if such lien shall attach, Lessee shall promptly cause any such lien or any claim there or to be released or "bonded-off". Within ten (10) days of the ,completion of such work, Lessee shall provide Lessor with waivers of lien and paid receipts and invoices for all labor and material utilized for work performed on Lessee's behalf in the Leased Premises. If Lessee shall fail to discharge any lien, Lessor may ,do so, and Lessee shall pay the cost thereof as Additional Rent hereunder. Generally Lessee, shall not create or cause to be imposed, claimed of filed upon the Leased Premises, or upon any portion thereof, or upon the interest of Lessor therein, any lien, claim of lien, order for the payment of money, charge or other encumbrance whatsoever. If any such lien, order, charge or other encumbrance shall be imposed, claimed or filed, Lessee shall, at its sole cost and expense, immediately cause the same, to be fully paid and satisfied or otherwise discharged of record by bonding or otherwise. In the event that Lessee shall fail to comply with the foregoing provisions of this Section, such failure shall constitute a default hereunder and Lessor shall have, in addition to its other rights under this Lease, the option of paying, satisfying or otherwise discharging (by bonding or otherwise) such lien, charge or encumbrance and Lessee agrees to reimburse Lessor, upon demand and a Additional Rent, for all sums so paid and for all costs and expenses incurred by Lessor in connection therewith, together with interest thereon, until paid.

6

8.5   <u>Construction Liens</u>. Lessor's interest in the Leased Premises shall not be subjected to liens of any nature by reason of Lessee's construction, alteration, repair, restoration, replacement, or reconstruction of any improvements on or in the Leased Premises, including those arising in connection with or as an incident to, the construction of any Lessee improvements or permitted Alterations, or by reason of any other act or omission of Lessee (or of any person claiming by, through or under Lessee) including, but not. limited to, mechanics and materialmen's liens. All persons dealing with Lessee are hereby placed on notice that such' person shall not look to Lessor or to Lessor's credit or assets, for payment or satisfaction of any obligations incurred in connection with the construction, alteration, repair, restoration, replacement or reconstruction thereof by or on behalf of Lessee.

8.6   <u>Renovation</u>.   Lessor will renovate the upstairs lobby and bar area.  The Lessee shall be responsible for any improvements to the Kitchen and non-lobby dining areas.  In the event Lessee wants input as to the lobby build-out and design other than Lessor's scheduled plans, Lessee shall contribute 50% of the total build-out costs.

ARTICLE 9
MAINTENANCE OF LEASED PREMISES AND PERSONALTY

9.1    Lessee shall take good care of the Personalty and the Leased Premises and the fixtures and appurtenances therein and, at its sole cost and expense, make all repairs thereto as and when needed to preserve them in good working order and condition. Without limiting the foregoing, Lessee will be responsible, at Lessee's expense, for keeping the air conditioning, electrical, and plumbing systems which service the Leased Premises in good working order. Lessee shall also maintain a service contract for the air conditioning and refrigeration systems servicing the Leased Premises which shall provide for monthly maintenance and, servicing of such systems. Lessee shall also make all repairs to its leasehold improvements. Lessee shall not be entitled to any abatement of rent or other economic relief due to any interruption of service. All damage or injury to the Leased Premises and to its fixtures, signs, glass, appurtenances and equipment, caused by Lessee moving property in or out of 'the Building, or by installation or removal of furniture, fixtures or other property, or resulting from fire, explosion, air-conditioning unit or system, short circuits, flow or leakage of water, steam, illuminating gas, sewer gas, sewerage or odors or by bursting or leaking of pipes or plumbing works or gas, or from any other cause of any other kind or nature whatsoever, due to carelessness, omission, neglect, improper conduct or other cause of Lessee, its servants, employees, agents, visitors or licensees, shall, be repaired, restored or replaced promptly by Lessee, at its sole cost and expense, to the satisfaction of Lessor. All aforesaid repairs, restorations and replacement shall be in quality and class equal to the work or installations replaced and shall be done in a good and workmanlike manner.  The cost of the repair and maintenance of the lobby air conditioning shall be shared equally by the Lessor and Lessee.

9.2   <u>Condition of Leased Premises and Personalty on Surrender</u>. At the expiration of the tenancy hereby created, Lessee shall surrender the Leased Premises and the Personalty in clean condition and in good repair, except only reasonable wear and tear. Lessee shall surrender all keys for the Leased Premises to Lessor at the place then fixed for the payment of Rent and shall inform Lessor of all combinations on locks, and burglar alarms, in the Leased Premises. Lessee agrees to repair completely to good condition all portions of the Leased Premises damaged by Lessee's removal of Lessee's trade or other fixtures. Lessee's obligation to observe or perform this covenant shall survive the expiration or other termination of the term of this Lease.

ARTICLE 10
LAWS, ORDINANCES, REQUIREMENTS OF PUBLIC AUTHORITIES

10.1   Lessee shall, at its expense, comply with all laws, orders, ordinances and regulations of Federal, State, County and Municipal authorities and with any direction made pursuant to law of any public officer or officers which shall, with respect to the



7

occupancy, use or manner of use of the Leased Premises or to any abatement of nuisance, impose any violation, order or duty upon Lessor or Lessee arising from Lessee's occupancy, use or manner of use of the Leased Premises or any installations made therein by or at Lessee's request or required by reason of a breach of any of Lessee's covenants or agreements hereunder.

10.2   If Lessee receives written notice of any violation of law, ordinance, rule, order or regulation applicable to the Leased Premises, it shall give notice thereof to Lessor within one (1) business day of Lessee's receipt.

10.3   Lessee shall be responsible for obtaining any required licensees, permits or building permits from the City of Miami Beach and any other regulatory authorities. All of Lessee's improvements and renovations shall be subject to the approval of the City of Miami Beach and Lessor.

## ARTICLE 11
## FLOOR LOAD; NOISE

11.1   Lessee shall not place a load upon any floor of the Leased Premised which exceeds the load per square foot which such floor was designed to carry or which is allowed by law.

11.2   Business machines, music equipment, and mechanical equipment belonging to Lessee which cause noise, vibration or any other nuisance that may be transmitted to the structure or other portions of the Building or to the Leased Premises to such a degree as to be objectionable to Lessor, or which interfere with the use or enjoyment by other Lessees of their premises shall be placed and maintained by Lessee, at Lessee's cost and expense, in settings of cork, rubber or spring type' vibration eliminators sufficient to eliminate noise or vibration.

## ARTICLE 12
## INSURANCE AND INDEMNITY

12.1   Liability Insurance. Lessee shall, during the entire; term hereof, keep in full force and effect a policy or policies of public liability and property damage insurance, including liquor liability insurance, with respect to the Leased' Premises, and the business operated by Lessee in the Leased Premises in which the limits of public liability shall be not less than a combined single limit of One Million Dollars ($1,000,000.00) each occurrence/aggregate. These policies shall name Lessor, any other person, firms or corporations designated by Lessor, and Lessee as additional insured, and shall contain a clause that the insurer will not cancel or change the insurance without first giving Lessor at least thirty (30) days prior written notice. In the event Lessee fails, to provide such evidence or in the event of cancellation, termination or change of such insurance, Lessor may procure such insurance for Lessee and the cost thereof shall be charged as additional rent hereunder.

12.2   Liquor License.  Lessor owns the existing liquor license which Lessee may use in connection with his restaurant so long as Lessee complies with all applicable rules and regulations of the City of Miami Beach, County of Dade and State of Florida. Lessee shall be required to carry liquor liability insurance with Lessor named as an additional insured.  Any violation of the rules and regulations as aforesaid by Lessee or his employees shall be a default under the Lease.

12.3   Workman's Compensation Insurance.   Lessee shall carry workman's compensation insurance for all of his employees as required by the laws of the State of Florida.

12.4   Casualty Insurance. Casualty insurance for the full insurable value of the Personalty and to reimburse for the loss of all of Lessee's fixtures, equipment, personal property.



8

12.5   <u>Responsible Companies; Named Insureds</u>. All insurance shall be written by a company or companies qualified to do business in Florida and reasonably acceptable to Lessor. A certificate or duplicate policies showing such insurance in force shall be delivered to Lessor prior to the commencement of the Lease Term, and such insurance and updated certificates or renewed policies shall be maintained with Lessor throughout the Term of this Lease.  All policies of insurance required by this Article 12 shall: (i) indicate Lessor as named additional insured; (ii) provide that ,no material change, cancellation or termination shall be effective; until at least thirty (30) days after written notice to the additional and named insured; and (iii) contain an endorsement, to the effect that no act or omission of Lessee shall affect the obligation of the insurer to pay the full amount of the loss sustained.  If, the Leased Premises shall be partially damaged by fire or other cause without the fault or neglect of Lessee, Lessee's servants, employees, agents, visitors or licensees, such damages may be repaired by, and at the expense of Lessor and the Base Rent, until such repairs shall be made, shall be abated according to the part of the Leased Premises which is usable by Lessee. However, if such partial damage is due to the fault or neglect of Lessee, Lessee's servants, employees, agents, visitors or licensees, without prejudice to any other rights and remedies of Lessor and without prejudice to the rights of subrogation of Lessor's insurer, the damages may be repaired by Lessor but there shall be no apportionment or abatement of Base Rent. In either case, Lessor shall notify Lessee within thirty (30) days after the occurrence of damage as to whether or not Lessor will make repairs. No penalty shall accrue for reasonable delay which may arise by reason of adjustment of insurance on the part of Lessor and for reasonable delay on account of "labor troubles", or any other cause beyond Lessor's control. Lessee shall give immediate notice to Lessor in case of fire in the Leased Premises.  Notwithstanding the foregoing, if the Leased 'Premises are totally or substantially damaged or are rendered wholly or substantially unleasable by fire or other cause, and if Lessor shall decide not to restore or not to rebuild the same, or if 50% or more of the Building shall be so damaged (whether or not the Leased Premises have been damaged), or if the Building shall be so damaged that Lessor shall decide; to demolish it or to rebuild it (whether or not the Demised Premises have been damaged), then, or in any of such events, Lessor may, within ninety (90) days after such fire or other cause, give Lessee a notice in writing of such decision (which notice shall be given as in Article 24 hereof provided), and thereupon the term of this' Lease shall expire by lapse of time upon the third day after such notice is given, and Lessee shall vacate the Demised Premises and surrender the same to Lessor. If Lessee shall not be In default under this Lease, then upon the termination of this Lease under the conditions provided- for in the sentence immediately preceding, Lessee's liability for rent shall cease as of the day following the casualty. If the damage or destruction be due to the fault or neglect, of Lessee, the debris shall be removed by, and at the expense' of, Lessee and, if Lessee shall fail to remove same, such removal may be done by Lessor at the expense of Lessee. No damages, compensation or claims shall be payable by Lessor for inconvenience, loss of business or annoyance arising from any repair or restoration of any portion of the Leased Premised or of the Building.

12.6   <u>Waiver of Claims and indemnification of Lessor</u>. Lessor and Lessor's agents and employees shall not be liable for and Lessee waives all claims for damage to person or property sustained by Lessee or any party claiming through Lessee resulting from any accident or occurrence in or upon the Leased Premises, including but not limited to such claims for damage resulting from the' following: (a) any damaged, faulty or non-working equipment or appurtenances; (b) Lessor's failure to keep the property surrounding the Leased Premises in repair; (c) any defect in or failure of any structural system, plumbing, heating or air conditioning equipment, electric wiring or installation thereof, gas, water, steam pipes, stairs, porches, railings or walks; (d) the breaking of glass, roof leakage, the backing up of any sewer pipe or downspout, the bursting, leaking or running of any tank, tub, washstand, water closet, waste pipe, drain or any other pipe'. or tank in or upon the Leased Premises, it being agreed that all of the same are under the control and are the responsibility of Lessee; (e) water, being upon or coming through the ceiling, walls, stairs, of the Leased Premises or otherwise; and (f) the falling of any fixture, plaster or stucco the Building.  Lessee shall indemnify Lessor and save it harmless from and. against any and all claims, actions, damages,



liability and expense in connection with loss of life, personal, injury and/or injury or damage to property arising from or out of any occurrence in, upon or at the Leased Premises, or the occupancy or use by Lessee of the Leased Premises or any part. thereof, or occasioned wholly, or in part by any act or omission of Lessee, its agents, contractors, employees, servants, Lessees or trespassers. In case Lessor shall be made a party to any litigation commenced by or against Lessee (except where Lessee is suing Lessor), then Lessee shall protect and hold Lessor harmless and shall pay all costs, expenses and reasonable attorney's fees incurred or paid by Lessor in connection with, such litigation. Lessee shall also pay all reasonable attorney's fees (at all trial and appellate levels and as otherwise incurred by Lessor) that may be incurred or paid by Lessor in 'enforcing the covenants and agreements in this Lease.

## ARTICLE 13
### OFFSET STATEMENT ATTORNMENT SUBORDINATION

13.1 Estoppel Certificates. Lessee shall, at any time from time to time, not less than ten (10) days after written request from Lessor, execute, acknowledge and deliver to Lessor an estoppel certificate in writing certifying: (a) that this Lease is unmodified and in full force and effect (or if there have been modifications, that the Lease is in full force and effect as modified and stating the modifications); (b) the dates to which the Refit and, any other charges hereunder have been paid by Lessee; (c) that Lessee is not in default in the payment of Rent or any additional charges to Lessor or in the performance of any of Lessee's obligations hereunder, or, if in default, stating such default; (d) whether or not, to the best knowledge of Lessee, Lessor is in default in the performance of any covenant, agreement or condition contained in this Lease, and if so, specifying the nature of such default; (e) that so far as Lessee knows, neither party has any offsets, counterclaims or defenses or, if either party has any such offsets, counterclaims or defenses, stating them; (f) the address to which notices to Lessee are to be sent; and (g) any other matters which maybe reasonably requested by Lessor.

Any such certificate delivered by Lessee may be relied upon by any owner, prospective purchaser and/or any mortgagee or prospective mortgagee of the Leased Premises.

13. 2 Attornment. Lessee shall and hereby agrees to attorn, and be bound under all of the terms, provisions, covenants and conditions of this Lease, to any successor of the interest of Lessor under this Lease for the balance of the term of this Lease remaining at the time of the succession of such interest to such successor. In particular, in the event that any proceedings are brought for the foreclosure of any mortgage encumbering any or all, or a portion of, the Leased Premises, Lessee shall attorn to the purchaser at any such foreclosure sale and recognize such purchaser, as Lessor under this Lease, subject, however, to all of the terms and conditions of this Lease. Lessee agrees that neither the, purchaser at any such foreclosure sale nor the foreclosing mortgaged shall have any liability for any act or omission, be subject to any offsets or defenses which Lessee may have as claim, or be bound by any advance rents which may have been paid by Lessee to. any' other person, firm or entity including without limitation any prior Lessor for more than the current period in which such Rents come due.

13.3 Subordination. This Lease, Lessee's interest hereunder, and Lessee's leasehold interest in and to the Leased Premises are hereby agreed by Lessee too be and are hereby made junior, inferior,, subordinate and subject, in right, title, interest, lien, encumbrance, priority, and all other respects to any mortgage or mortgages now or hereafter in force and effect upon or encumbering any or all, or any combination, of the Leased Premises or any parts thereof, and to all future modifications, extensions, renewals, consolidations and replacements of, and all amendments and, supplements to any such mortgage or mortgages. Lessor agrees to use Lessee's best efforts to obtain from the holder of any mortgage hereafter placed on the Leased Premises an agreement not to disturb Lessee's use and enjoyment of the Leased Premises pursuant to the terms of this Lease so long as Lessee is not in default hereunder (although Lessor shall not be obligated to pay any sums or make any, financial concessions to



10

obtain such agreement). The foregoing, subordination provisions of this Section shall be automatic and self-operative without the necessity of the execution of any further instrument or agreement of subordination on the part of Lessee. However, Lessee agrees to execute and deliver, not later than fifteen (15) days after receipt of a written request therefor from Lessor or the holder or proposed holder of any mortgage, any further instrument or agreement of subordination of this Lease, Lessee's interest hereunder or Lessee's leasehold interest in the Leased Premises to any such mortgage or mortgages in confirmation or furtherance of or in addition to the foregoing subordination provisions of this Section.

## ARTICLE 14
## ASSIGNMENT AND SUBLETTING

14.1  <u>Consent Required</u>. Lessee shall not transfer, mortgage, encumber or assign its interest in this Lease in whole or in part, nor sublet all or any part of the Leased Premises, without the prior written consent of Lessor in each instance, which consent may be given or withheld by Lessor in Lessor's sole and absolute discretion. The consent by Lessor to any assignment or subletting shall not constitute a waiver of the necessity for such consent to any subsequent assignment or subletting. The consent by Lessor to an assignment shall serve to release Lessee, from any further liability under this Lease, so long as the assignee assumes Lessee's obligation under this Lease. This prohibition against assigning or subletting shall be construed to include a prohibition against any assignment or subletting by operation of law. If this Lease be assigned, or if the Leased Premises or any part thereof be sublet or occupied by anyone other than Lessee, Lessor may collect rent from the assignee, sublessee or occupant, and apply the net amount collected to the Rent, herein reserved, but no such assignment, subleasing, occupancy or collection shall be deemed a waiver of this covenant, or the acceptance of the assignee, sublessee or occupant as Lessee, or a release of Lessee from the further performance by Lessee of covenants on the part of Lessee herein contained. Notwithstanding any assignment or sublease, Lessee shall remain fully liable on this Lease, and shall not be released from performing any of the terms, covenants and conditions of this Lease. For purposes of this Article 14, any mortgage, encumbrance or transfer of any interest in Lessee shall be deemed to be a mortgage, encumbrance or transfer by Lessee of its interest in this Lease.

14.2  <u>Assignment in Bankruptcy</u>. Notwithstanding any of the foregoing provisions, covenants, and conditions of Section 14.1 above to the contrary, in the event that this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy, Code, 11 U.S.C. 101 et seq. (the "Bankruptcy Code"), any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Lessor, shall be and remain the exclusive property of Lessor and shall not constitute property of Lessee or of the estate of Lessee within the meaning of the Bankruptcy Code. Any and all monies or other consideration constituting Lessor's property under the preceding sentence not paid or delivered to Lessor shall be held in trust for the benefit of Lessee and be promptly paid to or turned over to Lessor. If Lessee proposes to assign this Lease pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment., of this Lease on terms acceptable to Lessee, then notice of, such proposed assignment setting forth: (a) the name and address of such person, (b) all of the terms and conditions of such offer, and, (c) the adequate assurance to be provided-by Lessee to assure such person's future performance under the Lease, including, without limitation, the assurances referred to in the Bankruptcy Code, or any such successor or substitute legislation or rule thereto, shall be given to Lessor by Lessee no later than twenty (20) days after receipt by Lessee, but in any event no later than ten (10) days prior to the date that Lessee shall make application to a court of competent jurisdiction for authority and approval to enter into such assignment and assumption. Lessor shall thereupon have the prior right and option, to be exercised by notice to Lessee given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such person, less any brokerage commissions which may be payable out of the



consideration to be paid by such person for the assignment of this Lease. Any person or entity to which this Lease in assigned pursuant to the provisions of the Bankruptcy Code shall be deemed without further act or deed to have assumed all of the obligations arising under this Lease on and after the date of such assignment. Any such' assignee shall upon demand execute and deliver to Lessor an instrument confirming: such assumption. In addition to other Rent due hereunder, in the event of any assignment or subletting, any "Profits" with respect to the space so assigned or sublet shall be paid to Lessor as Additional Tent., hereunder. "Profits" Are hereby defined to be any amounts paid by the assignee or sublessee and/or consideration received by or on, behalf of Lessee with respect to any period in excess of the Base Rent and/or Additional Rent paid by Lessee to Lessor with respect to the same period relating to the space so assigned or sublet, less any brokerage fees paid to a third party broker by Lessee.

## ARTICLE 15
## WASTE, HAZARDOUS MATERIALS AND GOVERNMENTAL REGULATIONS'

15.1   Waste or Nuisance. Lessee shall not commit or suffer to be committed any waste upon the Leased Premises or any noise, nuisance, odor or any other act or thing which may disturb the, quiet enjoyment of any guest or other person within or outside of the Building, or which would interfere with the operation of the Hotel.

15.2   Hazardous Materials and Sewage Prohibited. Lessee shall at all times during the Term of this Lease keep the Leased Premises free of "Hazardous Materials", and neither Lessee nor any, of its employees, agents, invitees, licensees, contractors or, sublessee (if permitted) shall use, generate, manufacture, refine, treat, process, produce, store, deposit, handle, transport, release, or dispose of Hazardous Materials in, on or about, the Leased Premises, or the groundwater thereof, or otherwise cause, create or permit any violation of any, environmental federal, state or municipal law, decision, statute, rule, ordinance or regulation currently in existence or hereafter enacted or rendered.

15.3   Governmental Regulations   and General Conditions. Lessee shall, at Lessee's sole cost and expense, promptly comply with all laws, ordinances, orders and regulations affecting the Leased Premises and the cleanliness, safety, operation and' use thereof. Lessee also agrees to comply with the recommendations of any insurance company, inspection bureau or similar agency with respect to the Leased Premises. Lessee agrees not to do any of the following: (1) permit any unlawful or immoral practice to be carried on or committed on the Leased Premises; (2) make any use of or allow the Leased Premises to be used for any purpose that might invalidate or increase the rate of insurance thereof; (3) keep or use or permit to be kept or used on the Leased Premises, any, inflammable fluids or explosives; (4) use the Leased Premises for any purpose whatsoever which might create a nuisance; or (5) deface or injure the Leased Premises. Lessee, shall comply with the requirements of Florida law which allow for the training of employees in order for Lessee to limit Lessee's liability for serving liquor to minors or "habitual drunkards".

Lessee agrees not to install any electrical equipment that overloads lines in the Leased Premises. In connection with the installation of any electrical equipment, Lessee shall, at Lessee's own expense, make whatever changes are necessary to comply with the requirements of the insurance underwriters, governmental authorities the inspection bureaus or of insurance inspectors designated by Lessor. Lessee agrees not to use any electrical equipment that contains a heating element unless same is used in connection with a red pilot light connected and operated in compliance with the underwriters' specifications.

## ARTICLE 16
## EMINENT DOMAIN

If the Leased Premises or any part thereof shall be taken under eminent domain proceedings, Lessor may, at Lessor's option, terminate this Lease as of the date when possession, is taken. All damages, awarded for such taking shall belong to and be the property of Lessor. Lessee shall have no claim against Lessor by reason of such taking or termination and shall not have any claim or right to any portion of the amount that may be awarded or paid to Lessor as a result of any such taking. In any event, the entire compensation awarded in or by reason of said eminent domain proceedings shall belong to Lessor without any deduction therefrom for any present or future estate or interest of Lessee and Lessee hereby assigns to Lessor all of Lessee's right, title and interest, in and to any and all such compensation together with any and all rights, estate and interest of Lessee now existing or hereafter arising in and to the same or any part thereof. Notwithstanding the foregoing, Lessee may make a separate claim for damages for loss of business suffered by Lessee.

## ARTICLE 17
## DEFAULT OF LESSEE

17.1   Rights of Lessor. In the event of any failure of Lessee to pay any Rent due within ten (10) days after the same shall be due, or any failure to perform any other of the terms, conditions or covenants of this Lease to be observed or performed by Lessee for more than ten (10) days after written notice of such failure shall have been given to Lessee, or such longer period, not to exceed an additional thirty (30) days, as may be reasonably necessary to cure such failure provided that such failure is of curable nature, but not within ten (10) days, and that Lessee has commenced, and diligently pursues, appropriate curative action (except that no grace period shall be applicable if the default involves a hazardous condition, a breach of Section 14.1 or Lessee's interference with the Hotel operation and a grace period of three (3) days after notice (or such shorter period as reasonably necessary to cure the default) shall be applicable if the default pertains to Lessee's operation of the Leased Premises and affects the operation of the Hotel), or if Lessee shall become bankrupt or insolvent, or file any debtor proceedings or take or have taken against Lessee in any court pursuant to any statute either of the United States or of any state a petition in bankruptcy or insolvency or for reorganization or for the appointment of a receiver or trustee of all or a portion of Lessee's or if Lessee or any such guarantor makes an assignment for the benefit of creditors, or petitions for or enters into an arrangement, or if Lessee shall vacate or abandon the Leased Premises, or suffer this Lease to be taken under any writ of execution, Lessor, in addition to all other rights or remedies it' may have under this Lease, by law, in equity, or otherwise, shall have the following described remedies:

(A)      Lessor shall have the immediate right of re-entry and may remove all persons and property from the Leased Premises and such property may be removed and stored in a public warehouse or elsewhere at the cost of, and for the account of Lessee, all without service of notice or resort to legal processed without being deemed guilty of trespass, or becoming liable for any loss or damage which may be occasioned thereby;

(B)      Lessor may, from time to time without terminating. this Lease, and without releasing Lessee in whole or in part from Lessee's obligations to pay Rent and perform any of the covenants, conditions and agreements to be performed by Lessee as provided in this Lease, relet the Leased Premises or any part thereof for, such term or terms (which may be for a term extending beyond the term of this Lease) and at such rental or rentals or upon such other terms and conditions as Lessor in its sole discretion may deem advisable; upon each such reletting all rentals received by Lessor from such reletting shall be applied, first, to the payment of any indebtedness other than rent due from Lessee to Lessor; second, to the payment of any costs and expenses of such reletting, including brokerage fees and attorney's fees and of costs of such alterations and repairs; third, to the payment of Rent due and unpaid hereunder; and the residue, if any, shall be held by Lessor and applied in payment of future Rent as the same may




become due and payable hereunder and if such rentals received from such reletting during any month be less than that to be paid during that month by Lessee hereunder, Lessee shall pay any such deficiency, to Lessor with such deficiency calculated and paid monthly and notwithstanding any such re-letting without termination, Lessor may at any time thereafter elect to terminate this Lease for such previous breach; and

(C)    Lessor may terminate this Lease in which event, it may recover from Lessee all damages it may incur by reason of such breach, including the cost of recovering the Leased Premises, reasonable attorney's fees, and the amount of Rent and charges equivalent to Rent reserved in this Lease for the remainder of the stated term, all of which amounts shall be immediately due and payable from Lessee to Lessor. Lessor's reentry, demand: for possession, a notice that the tenancy hereby created will be terminated on the date therein named, institution of an action of forcible detainer or ejectment or the entering of a judgment for possession in such action, or any other act or acts resulting in the termination of Lessee's right to possession of the Leased Premises shall not relieve Lessee from Lessee's obligation to pay the rent and other costs hereunder during the balance of the term or any extension thereof, except as herein expressly provided. Lessor may collect and receive any rent due from Lessee, and the payment thereof shall not constitute a waiver of or affect any notice or demand given, suit instituted or judgment obtained by Lessor, or be held to waive, affect, change, modify or alter the rights or remedies which Lessor has in equity or at law or by virtue of this Lease.

17.2    <u>Waiver of Notice</u>. Lessee hereby expressly waives the service of any notice of any election of remedies made by Lessor under this section, of demand for payment of, Rent or for possession, including any and every form of demand and notice (including, but not limited, to a three (3) day notice) prescribed by any statute or other law, except for any notice required to be given under the terms of this Lease.

17.3    <u>Cumulative Remedies</u>. All rights and remedies of Lessor herein created or otherwise existing at law, are cumulative' and the exercise of one or more rights or remedies shall not be taken to exclude or waive the right to-exercise of any other.

## ARTICLE 18
## ACCESS BY LESSOR

Lessee agrees that Lessor, its agents, invitees, employees or servants or any person authorized by Lessor may enter the Leased Premises for all purposes of inspecting the condition of the; same to exhibit the same to prospective purchasers of the Leased Premises or any other reasonable purpose of Lessors provided, however, Lessor's rights hereunder shall not unreasonably interfere with Lessee's use and occupancy of the Leased Premises.

## ARTICLE 19
## LESSEE'S PROPERTY

19.1    <u>Taxes on Leasehold</u>. Lessee shall be responsible for and -shall pay before delinquency all municipal, county or state taxes assessed during the term of this Lease against; the Personalty, any leasehold interest or personal property of any kind owned by or placed in, upon or about the Leased Premises by Lessee.

19.2    <u>Loss and Damage</u>. Lessor shall not be liable for any damage to property of Lessee or of others located on the Leased Premises nor for the loss of or damage to any, property of Lessee or of others by theft or otherwise. Lessor shall not be liable for any injury or damage to persons or property resulting from fire, explosion, falling plaster, steam, gas, electricity, water, rain, leaks from any part of the Leased Premises, from the, pipes, appliances or plumbing works, from the roof, street or subsurface, or from any other place or by dampness or by any other cause of whatsoever nature. Lessor shall not be liable for any such damage caused by other Lessees or persons in the Leased Premises, occupants of adjacent property, or the public, or caused by

14

operations in construction of any private, public or quasi-public work. Lessor shall not be liable for any latent defect in the Leased', Premises. All property of Lessee kept or stored on the Leased, Premises shall be so kept or stored at the risk of Lessee only and Lessee shall hold Lessor harmless from any claim arising out of damage to the same, including subrogation claims by Lessee's, insurance carrier, unless such damage shall be caused by the willful act or gross neglect of Lessor.

19.3   Notice By Lessee. Lessee shall give immediate notice to Lessor in case of fire or accidents in the Leased Premises.

## ARTICLE 20
## PERSONALTY

Lessor makes no representations or warranties regarding the condition of the Personalty, the suitability hereof for Lessee's use, or any other matter regarding the Personalty. Lessee shall maintain the Personalty in a condition at least as good as that at the commencement of the Term and shall not permit any loss or damage to occur thereto, ordinary wear and tear excepted. Lessee shall be obligated to promptly replace any item of Personalty lost or damaged with a similar item of at, least equal quality which shall be the property of Lessor and shall be part of the Personalty leased by Lessor to Lessee pursuant to this Lease.

## ARTICLE 21
## OTHER PROVISIONS

**THERE IS NO ARTICLE 21.**

## ARTICLE 22
## OTHER COVENANTS

22.1   In addition to all of the other covenants made by, and obligations undertaken by, Lessee pursuant to the provisions of this Lease, Lessee further covenants that it will at all times during the term of this Lease:

(a)   Keep the Leased Premises, including equipment, facilities and fixtures therein, and the outside areas immediately adjoining the Leased Premises at Lessee's expense, clean, neat and in good order, repair and condition (including all necessary painting and decorating) and, at Lessor's expense, to keep all glass, including that in windows, doors and skylights in the lobby, clean and in good condition and to replace any glass which may be damaged' or broken with glass of the same quality.

(b)   May not use the Colony Hotel name, logo, or picture in referring to the location of the Leased Premises or in advertising and other printed material without the prior written consent of Lessor.

(c)   Not to take any action which would violate Lessor's labor contracts, if any, affecting the Building nor create any, work stoppage, picketing, labor disruption or dispute or any interference with the business of Lessor or any other Lessee or occupant of the Building nor cause any impairment, or reduction of the good will of the Building.

(d)   Not use or occupy the Leased Premises in any manner or for any purpose which would injure the reputation or impair the present or future value of the Leased Premises or the Building.

22.2   Upon payment by Lessee of the rents provided in this Lease, and upon the observance and performance by Lessee; of all terms,. provisions, covenants and conditions on Lessee's part to be observed and performed by it under this Lease,

Lessor covenants that Lessee shall quietly hold-and enjoy the Leased Premises for the Term, subject to all of the terms, provisions, covenants, and conditions of this Lease.

### ARTICLE 23
### HOLDING OVER AND SUCCESSORS

23.1  <u>Holding Over</u>.   If Lessee retains possession of: the Leased Premises or any part thereof after the termination of this Lease by lapse of time or otherwise, then Lessor may at its option within thirty (30) days after the termination of the term serve written. notice upon Lessee that such holding over constitutes either: (1) renewal of this Lease for one year, at double the Base Rental for the last year of such period; (2) creation of a month to month tenancy, upon the terms of this Lease except at double. the monthly Rent, for the last month of such period, or (3) creation of a tenancy at sufferance, at a rental of two hundred percent (200%) of. the Rent on the last day of the Lease term per day for the time Lessee remains in possession. if no such written notice is served, then a tenancy at sufferance with rental as stated at (3) shall have been created. Lessee shall also pay to Lessor all damages sustained by Lessor resulting from retention of possession by Lessee.

23.2  <u>Successors</u>.   All rights and liabilities herein given, to, or imposed upon, the respective parties hereto shall extend to and bind ·the several respective heirs, executors, administrators, successors and assigns of the said parties and if there shall be more than one Lessee, they shall all be bound jointly and severally by the terms, covenants and agreements herein. No rights, however, shall inure to the benefit of any assignee of Lessee unless` the assignment to such assignee has been approved by Lessor in writing.

### ARTICLE 24
### MISCELLANEOUS

24.1  <u>Unperformed Covenants of Lessee</u>. In the event Lessee shall fail to comply with and perform any of the covenants, conditions or agreements herein contained on Lessee's part to' be performed, Lessor shall have the right (but not be obligated) to perform any such covenants, conditions or agreements, and Lessee agrees to pay Lessor on demand, as additional rent hereunder, a sum equal to the amount expended by Lessor in the performance of such covenants, conditions or agreements. In the event Lessor shall perform any such covenants, conditions or agreements, Lessee agrees that Lessor, its agents or employees, may enter the Leased Premises and 'that such entry and such performance shall not constitute an eviction ·of Lessee, in whole or in part, nor relieve Lessee from the continued performance of all covenants, conditions and agreements of this Lease. Lessee further agrees that Lessor shall not, be liable for any claims for loss or damage to Lessee or anyone claiming through or under Lessee.

24.2   <u>Waiver</u>. The waiver by Lessor of any breach of any term, covenant or condition herein contained shall not be deemed to be a waiver of such term, covenant or condition or any subsequent breach of the same or any other term, covenant or condition herein contained. The subsequent acceptance of Rent hereunder by Lessor shall not be deemed to be a waiver of any preceding breach by Lessee of any term, covenant or condition of this Lease, other than the failure of Lessee to pay the particular Rent so accepted, regardless of Lessor's knowledge of such preceding breach at the time of acceptance of such Rent. No covenant, term or conditions of this Lease shall be deemed to have been waived by Lessor, unless such waiver be in writing by Lessor.

24.3   <u>Indemnity</u>. In consideration of the Leased Premises being leased to Lessee for the Rent and the other agreements made herein by Lessor, Lessee agrees that Lessee, at all times, will, indemnify and hold harmless Lessor from all losses, damages, liabilities and expenses (including reasonable legal fees and court costs at trial and all appellate levels) whatsoever, which may arise or be claimed against Lessor and be in favor of any persons firms or corporations, for any injuries or damages to the

persons or property of any persons, firms or corporations, consequent upon or arising from the use or occupancy of the Leased Premises by Lessee, or consequent upon or arising from any acts, omissions, neglect or fault of Lessee, Lessee's agents, employees, of invitees, or consequent upon or arising from Lessee's failure to comply with the terms and provisions of this Lease and/or any laws, statutes, ordinances, codes or regulations as herein provided; that Lessor shall not be liable to Lessee for any damages, losses or injuries to the persons or property of Lessee which may be caused by the acts, neglect, omissions or faults of any persons, firms or corporations, and that Lessee will indemnify and keep harmless Lessor from all damages, liabilities, losses, injuries, or expenses which may arise or be claimed against Lessor and be in favor of any persons, firms or corporations, for any injuries or damages to the person or property of any persons, firms, or corporations; where said injuries or damages arose about or upon said Leased Premises as a result of the negligence of Lessee, Lessee's agents, employees, or invitees. All personal property placed or moved into the Leased Premises shall be at the risk of Lessee or the owner thereof, and Lessor shall not be liable to Lessee for any damage to said personal property.

24.4   Accord and Satisfaction. No payment by Lessee or receipt by Lessor of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the stipulated Rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction, and Lessor may accept such check or payment without prejudice to Lessor's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

24.5   Entire Agreement. This Lease and any Exhibits attached hereto, set forth all the covenants, promises, agreements, conditions and understandings between Lessor and Lessee concerning the Leased Premises and there are no covenants, promises, agreements, conditions or understandings, either oral or written, between them other than are herein set forth. Except as herein otherwise provided, no subsequent alteration, amendment, change or addition to this Lease shall be binding upon Lessor or Lessee unless reduced to writing and signed by them.

24.6   No Partnership. Lessor does not, in any way or for any purpose, become a partner of Lessee in the conduct of its business, or otherwise, or joint venturer or a member of a joint enterprise with Lessee.

24.7   Notices. Any notice, demand, request or other, instrument which may be or are required to' be given under this Lease shall be delivered in person or sent by United States certified mail, postage prepaid, return receipt requested and shall be addressed: (1) if to Lessor at 736 Ocean Drive, Miami Beach, Florida 33139 or at such address as Lessor may designate by written notice and (2) if to Lessee 3322 Chase Avenue, Miami Beach, Florida 33139. Notices and demands shall be deemed given three (3) days after mailing or if made by personal delivery, then upon such delivery. Delivery to the Leased Premises shall be deemed delivery to Lessee whether or not Lessee is present to accept delivery.

24.8   Captions and Section Numbers. The captions, section numbers and paragraph numbers appearing in this Lease are inserted only as a matter of convenience and in no way shall be construed as defining or limiting the scope of intent of the provisions of this Lease nor in any way affect this Lease.

24.9   Governing Law. Florida law shall govern the validity, performance, interpretation and enforcement of this Lease.

24.10  Partial Validity. If any term, covenant or condition of this Lease or the application thereof to any party or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term; covenant or condition to parties or circumstances other than those as, to which it is held invalid or unenforceable shall not be affected thereby and each term, covenant or condition of this Lease shall be valid and enforced to the fullest extent permitted by law.

24.11 <u>Recordation</u>. Lessee shall not (or permit any person by, through or under Lessee to) record this Lease or a memorandum thereof, or reference thereto without the written consent of Lessor. Upon the request of Lessor, however, Lessee shall 'join in the execution of a memorandum or so-called "short-form" of this Lease (in a form and with a content satisfactory to Lessor) for, the purposes of recordation.

24.12 <u>Remedies Cumulative</u>.   The various rights, remedies, powers and elections of Lessor reserved, expressed or contained in this Lease, are cumulative and no one of them shall be deemed to be exclusive of the others or of such other rights, remedies, powers, options or elections as are now or may hereafter be conferred upon Lessor by law. The failure on the part of Lessor to exercise promptly any rights given hereunder shall not operate to forfeit or waived any of the said rights.

24.13 <u>Attorney's Fees</u>. If either party defaults in the performance of any of the terms, provisions, covenants and conditions of this Lease, and by reason thereof the other party employs the services of an attorney to enforce performance of the covenants, or to perform any service based upon such default then in any of said events the prevailing party shall be entitled to receive from the other party reasonable attorney's fees and All expenses and costs incurred by the prevailing party pertaining thereto (including costs and fees relating to any appeal) and in enforcement of any remedy.

24.14 <u>Security Interest</u>. Lessee hereby pledges and assigns, to Lessor a security interest in all the Personalty and the personal property, furniture, fixtures, goods and chattels of Lessee, which shall or may be brought or put on Leased Premises as security for the payment of the Rent herein reserved or performance, of any, other obligations of Lessee, and Lessee agrees that said lien may be enforced by distress, foreclosure or otherwise at the election of Lessor and does hereby agree to pay attorney's fees together with all costs and charges therefor incurred or paid by Lessor, including an appeal. Lessee agrees to execute a UCC-1, or any other documents required by Lessor or its counsel.

24.15 <u>Lessor's Consent or Approval</u>. Whenever Lessor's consent or approval is permitted or required under this Lease, except as expressly otherwise provided herein, Lessor's consent or approval may be granted, withheld or denied in Lessor's sole and absolute discretion.

24.16 <u>Force Majeure</u>.   Anything in this Lease to the contrary notwithstanding, neither Lessee, nor Lessor shall be deemed in default with respect to the failure to perform any of the terms, covenants and conditions of this Lease if same shall be due to "Force Majeure." The term, Force Majeure, as used in this Lease, shall mean any strike, lockout, civil commotion, war-like operation, invasion, rebellion, hostility, military or usurped power, sabotage, governmental-regulation or control, inability to obtain any material, service or financing, Act of God or any other, cause, whether similar or dissimilar, beyond the reasonable control of. Lessor or Lessee, as the case may be. Lack of funds shall,. not be deemed "Force Majeure".

24.17 <u>Time of the Essence</u>. Time is of the essence of each provision of this Lease.

24.18 <u>Limitation on Liability of Lessor</u>. Notwithstanding anything in this Lease to the contrary, in the event Lessee is awarded a money judgment against Lessor, or Lessee has any claim under or arising out of this Lease or Lessee's occupancy or use of the Leased Premises against Lessor, Lessee's sole recourse for satisfaction of such judgment and/or claim shall be limited to execution against Lessor's interest in the Leased Premises. Lessee shall have no right to set off against Rent any amount claimed to be owed by Lessor to Lessee or to otherwise withhold Rent for any alleged breach of this Lease by Lessor.  In no event shall Lessor or any shareholder, director, officer or partner of Lessor or any other person associated with Lessor be held to have any personal liability for satisfaction of any claims or Judgments that Lessee may have against Lessor or relating to this Lease or Lessee's use and/or occupancy of the Leased Premises.

18

24.19 <u>Broker</u>.  Lessor and Lessee each represent and warrant to each other that Cushman & Wakefield of Florida, Inc. representing the Lessor, is the sole broker in this transaction and no finder was involved in connection with this Lease.  If a claim for any brokerage fee in connection with this Lease is made against the Lessor or Lessee ("Indemnitee") by any other broker, salesman or finder claiming to have dealt by or through the other party to this Lease ("Indemnitor"), the Indemnitor shall indemnify and hold harmless the Indemnitee from and against any and all such claims.

24.20 <u>Waiver of Trial by Jury</u>.  LESSOR AND LESSEE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHTS WHICH EITHER MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, OR ANY COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN OR ACTIONS OF LESSOR AND/OR LESSEE).

24.21 <u>Radon Gas Notification</u>.  In accordance with the requirements of Florida Statutes Section 404.056 (8) the following notice is hereby given:

**RADON GAS**: Radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your County Public Health Unit.

24.22 <u>Rules and Regulations</u>.  Lessee agrees to comply with the rules and regulations attached hereto as Exhibit "A" and made' a part hereof, and such other rules and regulations as Lessor may reasonably promulgate from time to time.

**IN WITNESS WHEREOF**, Lessor and Lessee have executed this Lease Agreement as of the day and year first above written.

Signed, sealed and delivered
in the presence of:

_____
Print Name _____

**LESSOR:**

**COLONY HOTEL, LLC**, a Florida limited
liability company

By: _____
(JAMES CAVANAUGH, Manager

[CORPORATE SEAL]

_____
Print Name _____

_____
Print Name _____

**LESSOR:**

**VICENT THILLOY**

_____
Print Name_____

19

EXHIBIT "A"

## Rules and Regulations

1. Lessee shall pay all City, County and liquor licensing fees payable with respect to the use of the Leased Premises.

2. Staff shall enter the Leased Premises through the rear entrance.  Staff must be dressed properly (i.e. uniform) during set up as well as during service.  Said uniform shall be subject to approval by Lessor.

3. Lessee, at Lessee's own expense, shall cause the kitchen ansul system and mechanical ventilation system to be cleaned, serviced and tagged semi-annually and shall cause the grease filter to be cleaner weekly.

4. Lessee shall keep and maintain on the Leased remises the required number of fire extinguishers and shall keep an up-to-date first aid kit in the kitchen.

5. Lessee shall accept major credit cards.

6. Lessor shall clean and supply the bathrooms through closing and shall leave all bathrooms clean at the end of each night.

7. Any outdoor porch service stations must be approved by Lessor and must be kept by Lessee in good and clean condition at all times.

8. Lessee's employees shall only occupy those portions of the building covered under this Lease Agreement.

9. Lessee, at Lessee's cost, shall cause the grease trap to be cleaned out monthly by a licensed grease hauler or more frequently as required.

10. Lessee shall notify Lessor in writing at least 2 weeks in advance of any function at the Leased Premises which would result in any portion of the Leased Premises being closed to the public.

11. Lessee shall store all trash and refuse in appropriate containers in the garbage room (which Lessee shall keep in a good and clean condition) and shall attend to the daily disposal thereof in the manner and by the agency designated by Lessor.

12. Lessee shall receive and deliver all goods and merchandise only in the rear alleyway entrance and at times reasonably designated by Lessor.

13. Lessor shall not change the color or architectural treatment of the Leased Premises without the prior written consent of Lessor, which consent shall not be unreasonably withheld or delayed.

14. All personnel of Lessee providing room service shall wear name tag identification.

15. Lessee, at Lessee's own expense, shall have a licensed company exterminate the Leased Premises as needed.

16. Lessee shall remove all room service dishes and utensils from hallways at the end of each service and in a timely manner and shall cooperate with housekeeping to facilitate such removal.  Lessee shall inspect all hallways as required by housekeeping and management.

20

17   Lessor shall have the right to approve all room service pricing which must be reasonable.

18   Lessee agrees that Lessor shall have the right to allow photo shoots to take place in or about the leased premises without any payment or other consideration to Lessee so long as such activity does not interfere with Lessee's operation of the Leased Premises.   Lessee may allow photo shoots at the Leased Premises only with Lessor's prior approval and all payment or other consideration received shall be for the benefit of Lessor..

19.   Lessee will not be entitled to sell souvenirs with any representation or picture of the Colony Hotel or Colony Cafe.

20.   Lessee will not be entitled to store outside chairs or tables in the lobby at any time.

21.   Colony Hotel has the right to approve or disapprove the style of furniture to be placed in the leased area.

22.   Volume of music played in the leased area shall be t the discretion of the Lessor.

23.   Operating hours are breakfast, lunch and dinner seven (7) days a week.

24.   Lessee will have the outside and inside tables set up no later than 8 a.m. on a daily basis.

25.   Lessee will instruct waiters not to stand and congregate at the hotel front door, but instead place themselves at the sides of the restaurant so as to allow hotel patrons easy access in and out of the hotel.

26.   Waiters delivering food or drinks to patrons sitting outside will do so by way of the south alley and will not deliver food or drinks through the lobby.

27.   Lobby doors to remain closed so as to ensure that the lobby air conditioning does not freeze up which is to the benefit of all parties concerned.

29.   The tables in the lobby area shall be kept clean and presentable by Lessee. Lessee also agrees not to use the lobby as a storage or preparation area.

30.   Lessee shall not allow any smoking by any restaurant employee on the front terrace or front sidewalk, and the north and south alleyways adjacent to the Hotel.

EXHIBIT "B"

Personal Property

22

- 1 AMERICAN STANDARD 2 BASKET GAS DEEP-FRYER
- 1 AMERICAN STANDARD GAS SALAMANDER/BROWNER OVER-STOVE
- 1 AMERICAN STANDARD ELECTRIC FLAT-TOP GRIDDLE
- 1 AMERICAN STANDARD GAS GRILL
- 2 AMERICAN STANDARD 6 BURNER OVENS
- 3 ON LINE 2 DOOR UNDER STATION REFRIDGERATORS
- 1 LOW CASH REGISTO RISE ICE-CREAM FREEZER
- 1 UPRIGHT  REFRIDGERATOR
- 1 UPRIGHT FREEZER
- 1 2-DOOR UPRIGHT COMMERCIAL FREEZER
- 2 WALK-IN REFRIDGERATORS
- CLASSIC 2 COMPARTMENT STEAM-TABLE/PORTABLE
- 1 MICROWAVE OVEN
- 1 FOOD-PROCESSOR
- BUNN 2-BURNER COFFEE MAKER
- 1 ICE-TEA MAKER/HOLDER
- 1 FLOUR-BIN
- 6 FLATWARE SEPERATORS
- 20 SAUTE PANS SMALL
- 10 SAUTE PANS LARGE
- 15 COOKING TONGS
- 10 SPATUALS
- 10 LARGE KITCHEN SPOONS
- 4 HOTEL DINNER SERVICE TRAYS
- 8 COCKTAIL SERVICE TRAYS
- 10 BLACK BUS-TUBS
- 26 WIRE BREAD BASKETS
- VARIOUS ASSORTMENT STORAGE RACKS PLASTIC/STEEL
- 3 3-COMPARTMENT SINKS, 2-BAR, 1-KITCHEN
- 4 ICE-BIN SPEED RACK COMBOS/  BAR
- 3  2-DOOR BAR REFRIDGERATORS
- 1 CASH REGISTER
- 2 CASH DRAWERS
- 3 STEALTH TOUCH POS COMPUTERS
- 3 thermal paper pos printers foh
- 2 2-ply Epson pos kitchen printers boh
- 2 pc printers, 1 basic, 1 fax, copier combo
- 4 dell pc's for pos back office
- 4 flat-screen TV's, 3 hp 27", 1 35"  Magnavox
- 6 disco lights, 4-spots, 1-robot, 1-strobe
- 1 fog machine

- 2 mixer boards
- 4 mid-speakers
- 1 bass speaker
- 3 micro-phones
- 3 micro-phone stands
- 2 DVD players, 1 basic, 1 cavs karaoke unit
- 2 monitors
- 1 cavs karaoke machine
- 3 guitars
- 4 blue outside patio umbrellas
- 60 dining room indoor/outdoor chairs
- 27 dining tables, indoor/outdoor
- 7 heavy bar stools
- 7 high-top wood top bar tables
- 3 low-top wood top bar tables
- 28 stainless/black cushion bar stools
- 13 low aluminum bar chairs
- 1 acrylic low top bar table
- 1 blue cushion low bar couch
- 6 chrome and velvet vip bar ropes
- 112 6.25" b+b plates
- 42 12" dinner plates
- 21 9" appetizer plates
- 8 salad bowls
- 9 oval serving plates
- 100 white ramakins
- 60 black handled steak knives
- 127 dinner knives
- 123 dinner forks
- 75 table spoons
- 87 teaspoons
- 25 martini glasses
- 18 champagne flutes
- 16 brandy snifters
- 86 16 oz plastic water glasses
- 17 16 oz tumbler glasses
- 28 wine glasses
- 40 rocks glasses
- 10 high-ball glasses
- 8 bar shakers
- 3 shaker-strainers

- 2 bar muddlers
- 3 bar fruit garnish tray presenters
- 4 bar napkin straw presenters
- 80 check presenters
- 25 hotel sheet pans
- 15 hotel pans
- 12 1/6 pans
- 8 1/3 pans
- 22 cambro/lexan storage bins
- 12 various kitchen knives
- 48 sugar-caddies
- 60 salt pepper shakers
- 31 indoor/outdoor candle globes
- 140 blue linen dinner napkins
- 42 vinyl table clothes, blue-white
- 18 cloth table clothes, white
- 1 lighted plate menu display
- 4 propane outdoor patio heaters
- 2 commercial mop buckets
- 6 commercial wet-floor signs
- 14 various musicians pictures/decorations
- 5 wicker menu baskets
- 100 various bound menus
- 60 plastic menus
- 2 lighted wine display buckets
- 9 wine buckets
- 15 coffee mugs
- 12 cappuccino mugs
- 2 outdoor cast iron easels
- 14 dish glass racks, flatware racks, plate racks
-

## EXHIBIT "C"

### Breakdown of Leased Premises
### Totaling 3,275 Square Feet

1.    Kitchen – 835 square feet;

2.    Courtyard Hardscape and Bar – 960 square feet;

3.    Existing Terrace – 1,060 square feet; and

4.    South portion of Lobby – 420 square feet.


Additional storage space for Lessee is available for rent in the area called the Hibiscus Room, which is currently not included in the Leased Premises.

# EXHIBIT 2

## ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LESSOR

**THIS ASSIGNMENT** made as of this _____ day of April, 2007, by and between **VINCENT THILLOY** (hereinafter called "Assignor"), and **CHEF VINCENT, INC.**, a Florida corporation (hereinafter called "Assignee"):

### W I T N E S S E T H:

**WHEREAS**, The Assignor had previously entered into a certain Lease Agreement (the "Lease") with **COLONY HOTEL, LLC**, a Florida limited liability company, as Lessor, dated March ___, 2007, covering the premises on the first floor of the Colony Hotel containing 3,200 square feet, plus or minus, together with the areas necessary to access same for a high-end restaurant located at 736 Ocean Drive, Miami Beach, Florida 33139; and

**WHEREAS**, the Assignor has agreed to assign the Lessee's interest in said Lease to the Assignee, and the Assignee has agreed to accept and assume Assignor's interest in the aforesaid Lease.

**NOW, THEREFORE**, in consideration of the sum of $10.00 and other good and valuable consideration received from Assignee, the receipt of which is hereto acknowledged, Assignor hereby transfers and assigns to Assignee the interest of Assignor, including all security deposits and prepaid rent, in and to said Lease described above and Assignee, from the date hereof, shall henceforth, for all intents and purposes, be deemed the Tenant under said Lease.

**IN WITNESS WHEREOF**, the Assignor hereto has set its hand and seal on the day and year first above-written.

Signed, sealed and delivered
in the presence of:

Print Name _CEDRIC LAGE_

Print Name _TRACY G. STACLSON_

**ASSIGNOR:**

**VINCENT THILLOY**

For value received and in consideration of the foregoing Assignment, **CHEF VINCENT, INC.**, a Florida corporation ("Lessee"), hereby agrees to assume each and every obligation, condition, term, covenant, and agreement of the above-described

Lease to be kept and performed by the Lessee thereunder and for all intents and purposes, to be deemed the Lessee under said Lease.

Signed, sealed and delivered
in the presence of:

**ASSIGNEE:**

Print Name_____

**CHEF VINCNET, INC**, a Florida
corporation

Print Name_____

By:_____
        VINCENT THILLOY, President

(CORPORATE SEAL)

## CONSENT OF LESSOR

**COLONY HOTEL, LLC.**, a Florida limited liability company, being the Lessor under that certain Business Lease Agreement dated as of March ____, 2007 between the undersigned, as Lessor, and **VINCENT THILLOY**, as Lessee, covering the premises on the first floor of the Colony Hotel containing 3,200 square feet, plus or minus, together with the areas necessary to access same for a high-end restaurant located at 736 Ocean Drive, Miami Beach, Florida 33139, does hereby consent to the assignment of the Lease by the Lessee to **CHEF VINCENT, INC.**, a Florida corporation.

**IN WITNESS WHEREOF**, the undersigned has signed this instrument on this _____ day of April, 2007.

Signed, sealed and delivered
in the presence of:

**LESSOR:**

Print Name    L. STEYTLER

**COLONY HOTEL, LLC.**, a Florida
Limited liability company

Print Name    R.E. Oliphant

By:_____
        JAMES CAVANAUGH,
        Manager

(CORPORATE SEAL)

2

# EXHIBIT 3

- 1 AMERICAN STANDARD 2 BASKET GAS DEEP-FRYER
- 1 AMERICAN STANDARD GAS SALAMANDER/BROWNER OVER-STOVE
- 1 AMERICAN STANDARD ELECTRIC FLAT-TOP GRIDDLE
- 1 AMERICAN STANDARD GAS GRILL
- 2 AMERICAN STANDARD 6 BURNER OVENS
- 3 ON LINE 2 DOOR UNDER STATION REFRIDGERATORS
- 1 LOW CASH REGISTO RISE ICE-CREAM FREEZER
- 1 UPRIGHT  REFRIDGERATOR
- 1 UPRIGHT FREEZER
- 1 2-DOOR UPRIGHT COMMERCIAL FREEZER
- 2 WALK-IN REFRIDGERATORS
- CLASSIC 2 COMPARTMENT STEAM-TABLE/PORTABLE
- 1 MICROWAVE OVEN
- 1 FOOD-PROCESSOR
- BUNN 2-BURNER COFFEE MAKER
- 1 ICE-TEA MAKER/HOLDER
- 1 FLOUR-BIN
- 6 FLATWARE SEPERATORS
- 20 SAUTE PANS SMALL
- 10 SAUTE PANS LARGE
- 15 COOKING TONGS
- 10 SPATUALS
- 10 LARGE KITCHEN SPOONS
- 4 HOTEL DINNER SERVICE TRAYS
- 8 COCKTAIL SERVICE TRAYS
- 10 BLACK BUS-TUBS
- 26 WIRE BREAD BASKETS
- VARIOUS ASSORTMENT STORAGE RACKS PLASTIC/STEEL
- 3 3-COMPARTMENT SINKS, 2-BAR, 1-KITCHEN
- 4 ICE-BIN SPEED RACK COMBOS/ BAR
- 3  2-DOOR BAR REFRIDGERATORS
- 1 CASH REGISTER
- 2 CASH DRAWERS
- 3 STEALTH TOUCH POS COMPUTERS
- 3 thermal paper pos printers foh
- 2 2-ply Epson pos kitchen printers boh
- 2 pc printers, 1 basic, 1 fax, copier combo
- 4 dell pc's for pos back office
- 4 flat-screen TV's,  3 hp 27",  1 35"  Magnavox
- 6 disco lights, 4-spots, 1-robot, 1-strobe
- 1fog machine

- 2 mixer boards
- 4 mid-speakers
- 1 bass speaker
- 3 micro-phones
- 3 micro-phone stands
- 2 DVD players, 1 basic, 1 cavs karaoke unit
- 2 monitors
- 1 cavs karaoke machine
- 3 guitars
- 4 blue outside patio umbrellas
- 60 dining room indoor/outdoor chairs
- 27 dining tables, indoor/outdoor
- 7 heavy bar stools
- 7 high-top wood top bar tables
- 3 low-top wood top bar tables
- 28 stainless/black cushion bar stools
- 13 low aluminum bar chairs
- 1 acrylic low top bar table
- 1 blue cushion low bar couch
- 6 chrome and velvet vip bar ropes
- 112 6.25" b+b plates
- 42 12" dinner plates
- 21 9" appetizer plates
- 8 salad bowls
- 9 oval serving plates
- 100 white ramakins
- 60 black handled steak knives
- 127 dinner knives
- 123 dinner forks
- 75 table spoons
- 87 teaspoons
- 25 martini glasses
- 18 champagne flutes
- 16 brandy snifters
- 86 16 oz plastic water glasses
- 17 16 oz tumbler glasses
- 28 wine glasses
- 40 rocks glasses
- 10 high-ball glasses
- 8 bar shakers
- 3 shaker-strainers

- 2 bar muddlers
- 3 bar fruit garnish tray presenters
- 4 bar napkin straw presenters
- 80 check presenters
- 25 hotel sheet pans
- 15 hotel pans
- 12 1/6 pans
- 8 1/3 pans
- 22 cambro/lexan storage bins
- 12 various kitchen knives
- 48 sugar-caddies
- 60 salt pepper shakers
- 31 indoor/outdoor candle globes
- 140 blue linen dinner napkins
- 42 vinyl table clothes, blue-white
- 18 cloth table clothes , white
- 1 lighted plate menu display
- 4 propane outdoor patio heaters
- 2 commercial mop buckets
- 6 commercial wet-floor signs
- 14 various musicians pictures/decorations
- 5 wicker menu baskets
- 100 various bound menus
- 60 plastic menus
- 2 lighted wine display buckets
- 9 wine buckets
- 15 coffee mugs
- 12 cappuccino mugs
- 2 outdoor cast iron easels
- 14 dish glass racks, flatware racks , plate racks
-

# EXHIBIT 4

**DENNIS R. BEDARD**

ATTORNEY AT LAW

SUITE 215

1717 N. BAYSHORE DR.

MIAMI, FLORIDA 33132

---

TEL (305) 530-0795

FAX (305) 530-9587

FAX (305) 530-1449

E-MAIL: dennisbedard@bellsouth.net

November 29, 2007

Re:  Chef Vincent, Inc.
     Jean Marc and Davy Vujasin p/f
     Vincent Thilloy

To Whom It May Concern:

    I was the closing agent for the transaction where Jean Marc and Davy Vujasin purchased one hundred percent of the shares of Chef Vincent, Inc., a Florida corporation from Vincent Thilloy.   Thank you.

Sincerely,

Dennis R. Bedard

# EXHIBIT 5

23

## AGREEMENT FOR PURCHASE AND SALE OF ASSETS

This agreement is made as of ꝰ꙾ ─ ꙽꙾ꞈ    2007, between
ViNcent Thilloy (Seller) and Jean Marc Vujasin and Davy Vujasin (Buyer).

## RECITALS

A.    This agreement shall become operative, effective, and binding between the
parties on the date stated above.  This Agreement shall become null and void
on October 12, 2007, 5:00 P.M., if this Agreement is not signed by the Buyer
and delivered to Seller by that time and date.

B.    The consideration for this agreement is $800,000.00.  Buyer will make a
deposit of $400,000.00 upon signing to Dennis R. Bedard Trust Account.

C.    Seller is the owner of all of the shares of Chef Vincent, Inc., (the company).

D.    In consideration of the covenants and conditions contained in this agreement,
the parties, intending to be legally bound, agree:

E.    The Business. Subject to the terms and conditions of this agreement, Seller
agrees to sell and Buyer agrees to buy free from all liabilities and
encumbrances, except as otherwise provided in this agreement, the following
property:

1.  All of the outstanding shares of the company, including but not limited to
all goodwill, equipment, stock in trade, receivables incurred following closing,
licenses, fixtures, furnishings, equipment and machinery located at the
premises or used in connection with the operation of the business, together
with any rights to the Lease Agreement, wholly or partially described in
Exhibit A; the right to use all telephone numbers of the business; any and all
clients; any and all leasehold improvements; and the keys and all other indicia
of possession (the property). Buyer shall not assume any debts of Seller.
Buyer shall not sell, lease or otherwise dispose of any of the furniture,
fixtures, equipment and/or machinery of the business until any and all monies
owed to Seller are paid in full.  All security deposits currently held by landlord
and any and all utility deposits are included in sale price.

2

2.    Closing.  Closing shall take place on or before November 7, 2007, at the law offices of Dennis R. Bedard, 1717 North Bayshore Drive, Suite 215, Miami, Florida 33132, or at a place designated by Buyer.  Buyer will take possession of the business and begin operating the business on November 15, 2007.

3.    Purchase Price.  The purchase price for the shares shall be $800,000.00.  Any prepaid rent, prepaid insurance, personal property taxes, or any other charges, advances or debts of the business as of the date of possession shall be prorated at closing. Buyer shall reimburse to Seller at closing any and all deposits, which are not part of the sale.  Seller agrees that Buyer will re-imburse him for the security deposit ($44,400.00) held by landlord four years from the date of closing.

4.    Financing.  Seller shall provide buyer with financing in the amount of $400,000.00, payable as follows:

   a.  $50,000.00 within six months;

   b.  $350,000.00 payable within four years with no interest for the first two years and 5% interest for the remaining two years.  Buyer will allow Seller to register a UCC1 on all of the company's fixtures, assets, receivables, and bank accounts which shall be enforceable if Buyer is three months late in any monthly payments.  Buyer will sign a promissory note and security agreement at the time of closing that incorporates these provisions.

5.    Business Name. Buyer shall retain the right to use any and all business names of the company.

6.    Instruments of Conveyance. Seller shall deliver to Buyer at closing a bill of sale, affidavits and any other documents Buyer may reasonably request to vest in Buyer all right, title and interest to the business, free and clear of all liens, security interests and encumbrances except as otherwise specifically provided in this agreement.  Seller agrees to provide releases for any UCC 1's that encumber any property on the premises

Buyer: _____                2                Seller: _____

3

7.    Tax Claims. Seller shall deliver to Buyer at closing documents, affidavits, or other evidence reasonably satisfactory to Buyer's attorney demonstrating that no taxes which could attach to or become liens on the property sold are outstanding against the business or assets other than those for which adjustments in the purchase price are made.

8.    Leased Machinery and Equipment. All machinery and equipment is owned by Seller and not leased from any third party. Said machinery is free and clear of any debts.  Seller will provide an Affidavit of No Liens at time of closing.  Buyer will give Seller a credit at closing for all existing inventory.

9.    Representations by Seller. The following representations and warranties to Buyer are true as of the effective date of this agreement, shall be true at closing and shall survive the closing.
Seller is the owner of and has good and marketable title to the business and property described in paragraph 1, free of all debts, liens, security interests and encumbrances (except any debts to creditors outlined in the list of creditors to be delivered by Seller and satisfied at closing).

1)    Seller has entered into no contract relating to the business and property.

b.    There are no judgments, liens, actions, or proceedings pending or threatened against Seller.

c.    There are no violations pending or threatened against the business and/or the property .

e.    Seller has complied with all laws, rules and regulations relating to the business and property and is in full compliance with all local, state and federal regulations governing the operation of the business.

f.    Seller has paid in full, or will arrange payment in full at closing of all state and federal income tax withholding, federal social security tax (FICA) withholding, employment taxes, unemployment insurance, sales and use taxes, business or license fees, and any other business related or governmental charges.

Buyer: _____        3        Seller: _____

4

g.     Seller has not established or participated in any pension or retirement plan or program for the benefit of any present or former employees of the business to be transferred to Buyer.

h.     Seller is not insolvent, and will not be rendered insolvent by the transfer contemplated in this agreement. Seller is able to meet the business obligations as they become due.

i.     Seller has legal power to enter into and perform this agreement and the consummation of the transaction contemplated in this agreement will not result in breach or termination of any contract, mortgage or other instrument to which Seller is a party or by which Seller is bound.

j.     All equipment, fixtures, furnishings and machinery are being sold in good working conditions.  Buyer shall have five (5) days from the execution of this agreement to make any inspection it deems necessary.

k.     Seller has no employment or management agreements with any of its employees or others and all monies, benefits or remunerations due Seller's employees have been paid in full or will be paid in full as of the date of closing.  There are no current employees presently.

l.     There are no subleases to the business or to all or part of the premises.

m.     Seller does not know of, nor does there exist any hazardous or toxic contamination of the ground at or adjacent to the premises.  Required inspections by government entities have been made and have always resulted in proper licensing.

n.     Seller shall allow Buyer and/or his representatives to inspect and review Seller's books and records. Seller shall provide Buyer's accountant with any and all information required to determine the

Buyer: _____     4     Seller: _____

5

validity of Seller's representations.

o.     Seller holds all city, county and state permits and licenses for the operation of the business, including a current certificate of use and occupancy.

If anyone or more of the representations or warranties set forth above or a condition precedent contained otherwise in this agreement are not true, accurate and correct, or satisfied at closing, in addition to any other remedy provided by this agreement or by law, Buyer shall have the option, which may be exercised by written notice to Seller to terminate this agreement. Both parties being relieved from any further liability under this agreement Buyer may waive any condition and close under this agreement.

10.     Conduct of Business.
     A.  Seller will conduct the business in the normal and regular manner, and will not enter into any contracts except as may be required in the regular course of business. Seller shall maintain the stock in trade and merchandise level maintained until the effective date of this agreement.

11.     Risk of Loss. Seller retains all risk of loss due to fire or other casualty until closing.  If any loss occurs prior to closing, or if the business of Seller is closed or interrupted because of any event not in the ordinary course of business, Buyer. shall have the right to terminate this agreement on written notice to Seller, and upon such termination there shall be no further liability on Seller or Buyer. Any deposits held pursuant to paragraph 2 shall be promptly returned to Buyer. In the alternative, Buyer shall have the option of receiving any insurance proceeds payable as a result of the loss or other casualty and proceed with the purchase of the business pursuant to the terms of this agreement.

12.     Lease Agreement. This agreement is contingent upon Buyer's ability to obtain an assignment of the lease to the premises and an assignment of  the right to exercise any and all options contained in the original lease between landlord and Seller. Seller has a complete copy of the existing lease

Buyer: _____   5

Seller: _____

agreement prior to the execution of this agreement and it is fully aware of its[6] contents. If Buyer is unable to obtain an assignment of the existing lease and Seller is not fully released from the lease agreement, this agreement shall be voidable by Buyer.

13.    Transfer of Licenses.   Seller's interest in all licenses shall be transferred to the Buyer. Seller shall sign transfer applications, if needed, and deliver them to Buyer. Buyer agrees to diligently and promptly proceed with all requirements for filing of the transfer application. Seller agrees to sign any affidavit required to complete the transfer of any license. All of the above shall be at no cost or expense to Seller.

14.    Assignment.  Buyer may not assign this agreement without Seller's consent.

15.    Broker.  Barclay's Real Estate shall be paid a commission of _____% paid by Seller.

16.    Governing Law. This agreement shall be construed and governed in all respects in accordance with the laws of the State of Florida. If any provision of this agreement shall be held to be contrary to or in violation of the laws of the State of Florida, such illegality or invalidity shall not affect in any way any other provision of this agreement and all such other provisions shall continue nevertheless in full force and effect.

17.    Binding Effect. This agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns.

18.    Litigation Costs. If any legal proceeding is brought to enforce this agreement or any of its provisions, or because of a default in any representation, warranty, covenant, or other provision of this agreement, the successful or prevailing party shall be paid all costs including attorney's fees through any proceedings, trials, or appeals.

Buyer: _____          6          Seller: _____

7

19.    Default.  If Seller defaults under this agreement, Buyer at its option ( a) shall have the right to be released from all further obligations under this agreement, or (b) may seek specific performance of Seller's obligations, without waiving the right to damages.

20. Notices. Any notice, request, demand or other communication required or permitted by this agreement shall be properly given when deposited in the United States mail, postage prepaid, by certified or registered mail only, or when deposited with a public company for transmittal, charges prepaid, addressed as follows:

> As to Buyer:
>
> > Dennis R. Bedard
> > 1717 North Bayshore Drive
> > Suite 215
> > Miami, Florida 33132

> As to Seller:  736 Ocean Drive
> > Miami Beach, Florida 33139

21.    Entire Agreement. This agreement constitutes the entire contract of the parties and that there are no representations, warranties, covenants, promises, assurances or undertakings other than those expressly set forth in this agreement. This agreement supersedes any prior understandings or agreements, whether written or oral, between the parties. Parol evidence will not be used in any way to attack, modify, clarify, or interpret this agreement.

22.    Survival.  The representations, warranties, promises, covenants, agreements, indemnities, and undertakings of the parties contained in this agreement shall survive the closing and delivery of documents.

Buyer: _____ DU                    7                    Seller: _____

8

Signed by the parties at Miami, Miami-Dade County, Florida.

By:_____
Vincent Thilloy,
Seller
Dated:

Witness
Print Name:

Witness
Print Name:

By:_____
Jean Marc Vujasin
Buyer
Dated:

Witness
Print Name:

Witness
Print Name:

By:_____
Davy Vujasin
Buyer
Dated:

Witness
Print Name:

Witness
Print Name:

Buyer:_____    DV          8                    Seller:_____

# EXHIBIT 6

# BILL OF SALE

Known ALL MEN by These Presents, that Vincent Thilloy, party of the first part, for and in consideration of the sum of eight hundred thousand dollars ($800,000.00), to him paid by Jean Marc Vujasin and Davy Vujasin, party of the second part, the receipt whereof is hereby acknowledged has granted, bargained, sold, transferred and delivered, and by these presents does grant, bargain, sell, transfer and deliver unto the said party of the second part, its heirs, executors, administrators one hundred percent of his shares and ownership interest in Chef Vincent, Inc., a Florida corporation.

To Have and to Hold the same unto the said party of the second part, its heirs, executors, administrators and assigns forever.

AND it does, for itself and its heirs, executors and administrators, covenant to and with the said party of the second part, its heirs, executors, administrators and assigns, that it is the lawful owner of the goods and chattels; that they are free from all encumbrances; that it has good right to sell the same aforesaid, and that it will warrant and defend the sale of the said property, goods and chattels hereby made, unto the said party of the second part, its heirs, executors, administrators and assigns against the lawful claims and demands of all persons whomsoever.

In Witness Whereof, I have hereunto set my hand and seal this ３０ day of ___OCT___, 2007.

Signed, sealed and delivered in presence of:

_____
Signature

_Dennis R. Bedard_
Printed Name

_____
Signature

_Laurent Benjaquen_
Printed Name

_____
Vincent Thilloy

STATE OF FLORIDA
COUNTY OF MIAMI DADE

The foregoing instrument was acknowledged before me this ３０ day of ___OCT___, 2007, by Vincent Thilloy, who is personally known to me or has produced __FLA DL T400870600046-0__, as identification.

NOTARY PUBLIC-STATE OF FLORIDA
Dennis R. Bedard
Commission # DD677948
Expires: MAY 23, 2011

_____
Signature of Notary

# EXHIBIT 7

# PROMISSORY NOTE

$400,000.00                                        Miami, Florida
                                                   October 30, 2007

    FOR VALUE RECEIVED, the undersigned promises to pay to the order of Vincent Thilloy, the principal sum of Four Hundred Thousand Dollars ($400,000.00) until maturity, payable in lawful money of the United States, as follows:

    a. $50,000.00 within six months of the signing of this note; and
    b. $350,000.00 payable within four years of the date of this note with no interest for the first two years and 5% annual interest for the remaining two years.

    This Note may be prepaid, with all accrued interest, in whole or in part at any time without penalty. If this note is not paid on the due date, interest will accrue at the highest rate allowable by law.

    In the event of sale, exchange, assignment or other transfer of the property securing this Note prior to the maturity date hereof, this Note shall become immediately due and payable.

    The maker and endorser of this Note further agrees to waive demand, notice of non-payment and protest, and in the event suit shall be brought for the collection hereof, or the same has to be collected upon demand of an attorney, to pay reasonable attorney's fees for making such collection. This Note is secured by a security agreement and UCC 1 of even date herewith and is to be construed and enforced according to the law of the State of Florida; upon default in the payment of principal and/or interest when due, the whole sum of principal and interest remaining unpaid shall, at the option of the holders, become immediately due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of subsequent default.

Payable at:
Miami, Florida

_____
Jean Marc Vujasin

_____
Davy Vujasin

Dated: 10/30/07

## PROMISSORY NOTE

$44,400.00
                                        Miami, Florida
                                        October _____, 2007

    FOR VALUE RECEIVED, the undersigned promises to pay to the order of Vincent Thilloy, the principal sum of Forty Four Thousand Four Hundred Dollars ($44,400.00) until maturity, without interest, payable in lawful money of the United States, within four years of the date of this note:

    This Note may be prepaid, with all accrued interest, in whole or in part at any time without penalty. If this note is not paid on the due date, interest will accrue at the highest rate allowable by law.

    In the event of sale, exchange, assignment or other transfer of the property securing this Note prior to the maturity date hereof, this Note shall become immediately due and payable.

    The maker and endorser of this Note further agrees to waive demand, notice of non-payment and protest, and in the event suit shall be brought for the collection hereof, or the same has to be collected upon demand of an attorney, to pay reasonable attorney's fees for making such collection. This Note is secured by a security agreement and UCC 1 of even date herewith and is to be construed and enforced according to the law of the State of Florida; upon default in the payment of principal and/or interest when due, the whole sum of principal and interest remaining unpaid shall, at the option of the holders, become immediately due and payable. Failure to exercise this option shall not constitute a waiver of the right to exercise the same in the event of subsequent default.

Payable at:
Miami, Florida

_____
Jean Marc Vujasin

_____
Davy Vujasin

Dated: 10|30|07

# EXHIBIT 8

26

## SECURITY AGREEMENT

This **Security Agreement** ("Security Agreement") dated as of the 30 day of October 2007 is entered into by and among Chef Vincent, a Florida corporation, Jean Marc Vujasin, and Davy Vujasin (individually and collectively "Debtor"), whose address is 736 Ocean Drive, Miami Beach, Florida 33139, and Vincent Thilloy, the ("Secured Party").

### RECITALS

The Debtor and the Secured Party entered into a Purchase and Sale Agreement ("Purchase Agreement") on OCT. 12 ____, 2007, to purchase one hundred percent (100%) of the shares of Chef Vincent, Inc., a Florida corporation which operates a restaurant at 736 Ocean Drive, Miami Beach, Florida ("Business").

The Debtors signed a Promissory Note ("Note") in favor of Vincent Thilloy ("Thilloy") on even date herewith in the aggregate principal amount of Four Hundred Thousand U.S. Dollars ($400,000.00) (the "Loan").

In order to induce Secured Party to finance the acquisition of the Business, the Debtors have agreed to grant to the Secured Parties a security interest in certain property owned or to be owned by the Debtors as described below, to secure repayment of all liabilities, obligations, and indebtedness of the Debtors to the Secured Parties. Accordingly, the Debtors and the Secured Parties have executed this Security Agreement to record their understandings in writing.

### OPERATIVE TERMS

For ten dollars and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, and to induce Secured Party to finance the acquisition of the Business, the parties agree as follows:

1.     **Obligations Secured**. This Security Agreement and the lien granted herein secures the payment of the following (collectively, "Liabilities"): all obligations under the Note and all of the Debtors' other liabilities, obligations, and indebtedness (including interest thereon) to the Secured Parties under the Note, Purchase Agreement, Guaranty, Sublease Agreement executed by the Debtors, as the case may be, and any other document executed in connection with the Purchase Agreement, as either of them is amended, modified, restated, or replaced from time to time, regardless of whether the Secured Parties release any other collateral securing these obligations or release any obligor thereunder.

2.     **Grant of Security Interest**.   As security for the payment of the Liabilities, including any renewals, extensions, and changes in form of any of them, the Debtors pledge and grant to the Secured Parties a continuing security interest in and to:

(a)     All of the Debtors' right, title and interest in and to all ownership interests in Chef Vincent, Inc. (which ownership interests and ownership interests constitute 100% of all ownership interests in Chef Vincent, Inc.).  The term "ownership interest", as used

in the Security Agreement will mean all the ownership interests of Debtors that is pledged to Secured Party in accordance with this subsection;

(b)     Accounts including without limitation, accounts receivables, bank accounts and brokerage accounts;

(c)     Chattel Paper;

(d)     Documents;

(e)     General Intangibles;

(f)     Goods including, without limitation, personal property, tangible property, equipment, inventory and fixtures;

(g)     Instruments;

(h)     All cash or non-cash proceeds of any of the foregoing, including insurance proceeds and all products thereof;

(i)     All ledger sheets, files, records, documents and instruments (including, but not limited to, computer programs, tapes and related electronic data processing software) evidencing an interest in or relating to the above; and

(j)     Any and all property of the Debtors now or hereinafter delivered to or left in or coming into the possession, control or custody of any Secured Party, whether expressly as collateral security or for any other purpose (including cash, Ownership Interests and other dividends, and all rights to subscribe for securities incident to, declared, or granted in connection with such property), and property described in collateral receipts or other documents signed or furnished by any Debtor, and any and all replacements of any of the foregoing, whether or not in the possession of any Secured Party;

whether now existing or hereafter acquired or created, together with the products and proceeds thereof, all payments and other distributions with respect thereto and any and all renewals, substitutions, modifications, and extensions of any and all of the foregoing (the foregoing items will be referred to collectively as the "Collateral"), as security for the timely and full payment and satisfaction of the Liabilities as and when due. Each Secured Party shall release from the lien of this Security Agreement, at Debtor's request, any part of the Collateral described in the foregoing paragraphs (a) and (c), so long as the fair market value of the remaining Collateral is equal at all times to twice the amount of the indebtedness owed by Borrower to Secured Party under the Note. Items released in writing by Secured Party from time to time from the lien of this Security Agreement shall no longer be considered to be "Collateral" hereunder.

3.     **Collateral Documentation**.  In each instance that Debtor grants to Secured Party a security interest in one of its or his/her/their (as applicable) assets and properties pursuant to any of the provisions of this Security Agreement other than by perfection solely through delivery

of the assets and properties to Secured Party, Debtor shall deliver to Secured Party or its designee the following:

      (a)    if the assets are securities (other than an agreement or contract right), the certificates or other instruments representing such securities, endorsed in blank or with a Ownership Interests power or bond power endorsed in blank attached thereto, and together with a proxy authorizing Secured Party to exercise all Debtor's voting rights in such securities in a form requested by Secured Party; and

      (b)    if the assets are not securities, then at the request of Secured Party, a duly executed financing statement and such other documentation as Secured Party may require to perfect Secured Party's security interest in such asset or property under applicable law, in form and substance satisfactory to Secured Party.

The foregoing shall be delivered to Secured Party on or before the date of this Security Agreement with respect to then existing Collateral and thereafter concurrently with any asset or property becoming Collateral pursuant to this Security Agreement or any other document evidencing or securing the Loan. In addition to the foregoing, Debtor shall execute and deliver to Secured Party such other assignments, pledges, deeds, mortgages, financing statements, consents, and other documents as Secured Party may deem necessary or appropriate to evidence, confirm, or perfect any mortgage or security interest granted or required to be granted to Secured Party hereunder.

    4.    **Negative Pledge**.  Except for the security interest granted herein, no person or entity other than Debtor has any interest in the ownership interests pledged to Secured Party hereunder including in the Debtor. Furthermore, after the date of this Security Agreement, Debtor shall not pledge or grant a security interest in any of the ownership interests (in which Secured Party has a security interest) including in the Debtor, to any person or entity (other than Secured Party).

    5.    **Rights of Debtor to the Collateral**.  Subject to the provisions of this Security Agreement and until such time as Secured Party gives notice to Debtor to the contrary:

      (a)    Debtor shall have the full power and authority in the ordinary course of business to use any item of Collateral other than securities, to enter into, renew, modify, amend, purchase, sell, and terminate contracts in the ordinary course of business, to buy, sell, and lease equipment in the ordinary course of business, and to diligently service and collect the proceeds of any receivables constituting part of the Collateral; provided, however, that the exercise of that power shall not conflict with or prejudice the continued perfection of any security interest in any item of the Collateral or proceeds therefrom in the judgment of Secured Party.

      (b)    Debtor shall be entitled to exercise any and all voting, waiver, or consensual rights and powers relating or pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Security Agreement; provided, however, that Debtor shall not be permitted to exercise or refrain from exercising any

such right or power if, in the judgment of Secured Party, such action would have a material and adverse effect on the value of the Collateral (without limiting the generality of the foregoing limitation, Debtor shall not be permitted to exercise any such right or power if the exercise would authorize or effect the dissolution or liquidation, in whole or in part, of Debtor) and provided further that Debtor shall give Secured Party at least five (5) Business Days' notice of the manner in which Debtor intends to exercise or not exercise, together with the reasons for refraining from exercising, any such right or power other than with respect to any election of manager or any contract entered into in the regular course of business. Furthermore, Debtor shall execute and deliver to Secured Party, concurrently with its execution of this Security Agreement or at any later time requested by Secured Party, a proxy, authorizing Secured Party to vote the ownership interests at any time after the occurrence of an Event of Default (as defined in Section 8 hereof).

(c)     Debtor shall not be entitled to receive and retain any and all cash dividends (or distributions) and interest payable on the securities constituting part of the Collateral, but any and all dividends, returns of capital, or other distributions of cash or other assets or properties made on, in respect of, upon, in redemption of, in exchange for, or in payment of principal of any securities (whether resulting from a subdivision, combination, or reclassification of the outstanding capital structure of any issuer thereof, any merger, consolidation, acquisition, or other exchange of assets or securities to which any such issuer may be a party, any conversion, call, or redemption, or otherwise) shall be and become part of the Collateral pledged under this Security Agreement, and, if received by Debtor, shall be delivered immediately to Secured Party or its designee (accompanied by the documentation required under this Security Agreement) to be held as Collateral pursuant to this Security Agreement.

6.     **Litigation Respecting Collateral**.

(a)     In the event that any action, suit, or other proceeding (whether or not purportedly on behalf of Debtor) at law, in equity, in arbitration, or before any other authority involving or affecting the Collateral (a "Proceeding") is contemplated by Debtor or is otherwise commenced, Debtor shall give Secured Party immediate written notice thereof. However, until such time as Secured Party shall give notice to Debtor to the contrary, following the occurrence and during the continuance of an Event of Default (defined in Section 8 hereof), without regard, however, to whether or not Secured Party has declared a default, demanded or accelerated the Liabilities, or taken any other action under this Security Agreement or any other document evidencing or securing the Loan, the term "Proceeding" shall not include the arbitration of contracts in the normal course of Debtor's business. Within twenty (20) business days after its receipt of such notice, Secured Party shall notify Debtor that either (i) Secured Party will join in the Proceeding, (ii) a specified designee of Secured Party will join in the Proceeding, or (iii) Debtor may prosecute the Proceeding without the participation of Secured Party or its designee, any of which shall be in accordance with the provisions of subsection (b) of this Section 6. In the event Secured Party fails to respond to Debtor's notice of the Proceeding within that period, Secured Party shall be deemed to have elected alternative (iii) above, without,

however, waiving any right, power, privilege, or remedy of Secured Party under this Security Agreement, the Note, the Purchase Agreement, any of the other documents evidencing and securing the Loan, or applicable law.

(b)     If Debtor elects to commence a Proceeding or a Proceeding has otherwise commenced, Debtor shall cause the same to be prosecuted (i) in such manner that all the rights of Secured Party are preserved and protected to the fullest extent reasonably possible and (ii) with counsel to Debtor that is acceptable to and represents both Debtor and Secured Party. Subject to compliance by Debtor with the foregoing, (A) Secured Party shall join in the Proceeding and take any other action reasonably requested by Debtor's counsel to facilitate the prosecution thereof, all at the sole cost and expense of Debtor, and (B) the Proceeding may be prosecuted by Debtor in such manner as Debtor and its counsel deem appropriate. In any event, if Secured Party determines at any time during the pendency of a Proceeding (after consultation with counsel to Secured Party) that Secured Party's interests are at variance with the interests of Debtor, Secured Party may appoint other counsel to represent Secured Party in the Proceeding, and Debtor and its counsel shall cooperate with Secured Party and its counsel to the fullest extent possible in that Proceeding. Furthermore, Debtor shall pay all the reasonable fees and costs incurred by Secured Party in employing its counsel pursuant to this Section.

7.     **Power of Attorney**.  With respect to the Collateral that Secured Party or his designees hold or are entitled to obtain hereunder, Debtor hereby irrevocably makes, constitutes, and appoints Secured Party and each of its executive officers (Vice President and above), and each of them with full power of substitution, as Debtor's true and lawful attorneys-in-fact, with full power and authority from time to time in Debtor's name, place, and stead to: (a) take possession of and endorse (Secured Party or otherwise) any one or more contracts, mortgages, deeds, pledges, assignments, instruments, and other documents, and any one or more notes, checks, drafts, bills of exchange, money orders, or other documents received in payment for or on account of those assets and properties; (b) demand, collect and receive any monies due on account of those assets and properties and give receipts in connection therewith; (c) negotiate and compromise any claim, and commence, prosecute, defend, settle or withdraw any claims, suits, or proceedings, pertaining to or arising out of those assets and properties; (d) pay any indebtedness or other liability or perform any other obligation required to be paid or performed under this Security Agreement or any other documents evidencing or securing the Loan by Debtor, or any other person (other than Secured Party); (e) prepare and execute on behalf of Debtor any mortgage, financing statement, or other evidence of a security interest contemplated by this Security Agreement, or any modification, continuation, or extension thereof; (f) take any other action contemplated by this Security Agreement, the Note, the Guaranty or any other documents evidencing or securing the Loan; and (g) sign, execute, acknowledge, swear to, verify, deliver, file, record, and publish any one or more of the foregoing; provided, however, that the above named attorneys-in-fact may exercise the powers set forth in subsections (a), (b), (c), (d), and (f) of this Section only following the occurrence and during the continuance of an Event of Default, without regard, however, to whether or not Secured Party has declared a default, demanded or accelerated the Liabilities, or taken any other action under this Security Agreement or any other documents evidencing or securing the Loan. This Power of Attorney is hereby declared to be irrevocable, with full power of substitution and coupled with an interest.

6

This Power of Attorney shall survive the dissolution, reorganization, or bankruptcy of Debtor and shall extend to and be binding upon Debtor's successors, assigns, and legal representatives. This Power of Attorney may be exercised, among other ways, (i) by any one of the above named attorneys-in-fact, or by any substitute designated by any of those attorneys-in-fact, and (ii) by signing for Debtor individually on any document or instrument or by listing two or more of the persons, including Debtor, for whom any document or instrument is being signed and signing once, with a single signature by the attorney-in-fact or substitute being effective to exercise the Powers of Attorney of all persons so listed. A facsimile signature shall be effective if so affixed. Secured Party shall not be liable for any failure to collect or enforce the payment of any of those assets and properties.

8.  **Events of Default.**   Debtor will be in default under this Security Agreement upon the occurrence of any of the following events or conditions ("Event of Default"), regardless of the cause or whether within or beyond the control of Debtor:

(a)   The nonpayment of any interest or principal under the Note when due, whether at maturity, by acceleration, or otherwise;

(b)   The failure by Debtor to make a payment under the Purchase Agreement when due;

(c)   A default in the payment of any other Liability of  any Debtor to Secured Party including, without limitation under the Sublease Agreement;

(c)   Any breach of a term or condition in the Note, the Purchase Agreement, the Sublease Agreement, the Guaranty or the Sale Documents (as defined in the Purchase Agreement) by Debtor and/or Debtor;

(d)   The dissolution, cessation or liquidation of the business of Debtor;

(e)   If Debtor or Debtor shall make an assignment for the benefit of creditors, file a petition in bankruptcy, apply to or petition any tribunal for the appointment of a custodian, receiver, intervenor or trustee for Debtor (or Debtor, as applicable) or a substantial part of Debtor's or Debtor's assets; or if Debtor (or Debtor, as applicable) shall commence any proceeding under any bankruptcy, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; or if any such petition or application shall have been filed or proceeding commenced against Debtor or if any such custodian, receiver, intervenor or trustee shall have been appointed.; or

(f) If Debtor shall transfer or convey any of his/her/their ownership interests in Debtor, or if Debtor sells all or substantially all of its assets to any person or entity.

9.  **Rights of Secured Party to the Collateral.**

(a)   If any Event of Default shall have occurred and is continuing, Secured Party may take (and may cause one or more of its designees to take) any one or more of